(No. 21784.—

THE BENZOLINE MOTOR FUEL COMPANY, Plaintiff in Error, *vs.* A. C. BOLLINGER, Director of Finance, Defendant in Error.

*Opinion filed June 22, 1933—Rehearing denied October 6, 1933.*

STONE and DEYOUNG, JJ., dissenting.

GEORGE F. BARRETT, and CHARLES V. BARRETT, (BURRELL J. CRAMER, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General and MONTGOMERY S. WINNING, for defendant in error.

Per CURIAM: The Benzoline Motor Fuel Company, an Illinois corporation, as complainant, filed a bill in the circuit court of Sangamon county to restrain the defendant, Albert C. Bollinger, then Director of Finance, from paying into the State treasury the motor fuel tax paid by complainant for the month of January, 1928, amounting to $24,268.90. This tax was paid under the provisions of the Motor Fuel Tax act of 1927, which was held to be unconstitutional by this court on February 24, 1928, in the case of *Chicago Motor Club* v. *Kinney,* 329 Ill. 120. The complainant contended in its bill that the payment was involuntary and made under protest. A temporary injunction was issued, and subsequently the case was tried upon an amended bill and the answer thereto, oral testimony and a stipulation of facts. The bill was dismissed for want of equity, and a writ of error brings the case here.

The General Assembly in 1927 enacted the Motor Fuel Tax act, requiring distributors of motor fuels in this State to pay a tax of two cents per gallon on all motor fuel sold or used by them, with an allowance of three per cent reduction for evaporation and other loss, and with provisions for the imposition of penalties in case distributors failed or refused to comply with the act. At that time, and for a number of years prior thereto, the complainant was engaged in the business of distributing motor fuel as defined in the act but dealt almost exclusively with firms maintaining fleets of motor-driven vehicles; among them the Parmelee Company, the Chicago Motor Coach Company, the Hertz Drive-Ur-Self Company and the Yellow Cab Company. The complainant corporation was a large one, having in excess of half a million dollars invested in its business. Bearing a good reputation, to have become known as a trade violator would have worked serious injury to its business, which was highly competitive. After the act went into effect the complainant held a conference with its customers, and the consensus of opinion among them was that

the law was invalid. In order to hold its business the complainant was under the necessity of preventing it from being destroyed or interrupted by agreeing with its customers that it would apply for a distributor's license under the act, pay the taxes imposed under protest, and then seek to recover them for the benefit of its customers without expense to them. Having secured the license to distribute motor fuel under the act, the complainant commenced remitting tax payments to the Department of Finance. These payments were always accompanied by a protest against making a payment. The protests were based upon the supposed invalidity of the act, while the payments were made, as alleged, because it was compelled to do so by the fear of loss or destruction of its business. Of all the payments made, only the last one—that of February 18, 1929, for the period and amount mentioned—is in litigation. Accurate records of all motor fuel sold after the act went into effect were kept by complainant, so that at all times it knew the names of purchasers, their addresses, amount of motor fuel bought, in gallons, and the tax paid on the gasoline sold to each customer. The remittance in question was accompanied by this protest: "We are herewith sending you check of the Benzoline Motor Fuel Company, No. 20598, in the sum of $24,268.90, being amount of gasoline tax pursuant to notice heretofore sent us and which we are sending to you and paying to you under protest, as we believe that the law under which said tax is imposed is unconstitutional and null and void. Inasmuch as legal proceedings are at the present pending to test the validity of said law, we are making this payment under protest, so as to enable the Benzoline Motor Fuel Company to obtain a re-payment of all moneys paid under and by virtue of the provisions of said act."

Several motor fuel distributors brought suit to secure a refund of tax moneys paid under the act. These suits, upon review by this court, were decided against the dis-

tributors. (*Richardson Lubricating Co.* v. *Kinney,* 337 Ill. 122; *Indian Refining Co.* v. *Bollinger,* 337 id. 122; *Standard Oil Co.* v. *Bollinger,* 337 id. 353; *Agni Motor Fuel Co.* v. *Kinney,* 340 id. 17; *Standard Oil Co.* v. *Bollinger,* 348 id. 82.) Of those cases the *Standard Oil Co. case* last cited was the only one where the trial court heard evidence. All of the others were decided solely upon the pleadings. In the *Richardson case,* with which was consolidated the *Indian Refining Co. case,* the question of duress was raised by the facts set forth in the bill and answer, and upon those two pleadings, which this court necessarily had to assume to be true, we based our decision. The *Agni Motor Fuel Co. case* contained identically the same situation as the *Richardson case.* The first *Standard Oil Co. case* (337 Ill. 353) differed from the others only in containing an apparent protest. The bill and answer in that case, however, showed that the Standard Oil Company had no way of reimbursing its customers and would profit from a decree in its favor at the expense of customers who in reality had paid the tax money. The last *Standard Oil Co. case* cited (348 Ill. 82) was really a re-appearance in this court of the case reported in volume 337 for a determination of the correctness of the decree of the chancellor dismissing the bill for want of equity after the injection into the case of new averments and new evidence in their behalf. At the second hearing new averments were coupled to the original averments. In substance, the new averments stated that a portion of the tax sought to be refunded represented a tax upon motor fuel used by the Standard Oil Company in its own vehicles; that certain of the customers of the company protested the payment of the tax to it; that to these protesting customers the company agreed to make an attempt to recover the tax paid by them, and, should it succeed, a ratable restitution would be made. The company averred that it had never disclaimed an obligation to refund to its protesting customers the tax recovered, and that

it proposed to, and would, refund to *bona fide* protesting customers the amounts, figured on a *pro rata* basis, of all tax money recovered, this action being predicated upon an agreement to re-pay tax money recovered upon the *pro rata* amount of net recovery. The company additionally averred payment of the tax because of a fear that the State would enforce the penalties of the act against the company, and that the payments were therefore involuntary and made under duress. It was further averred that the tax money was held in trust by the director for the benefit of the company. The answers responding to the new averments denied the existence of a trust or the making of threats to compel the payment of the tax by the company. The answer further denied any injury to the company, inasmuch as the money was collected as a tax from the ultimate consumers and they had not been reimbursed by the company, which stood by all the time knowing that the consumer paid the tax; that the company had made no effort from August, 1927, to January, 1928, to recover the tax money, because it knew the proceeds thereof were to be used on the hard road system of the State, thereby increasing the business of the company, and that the tax was paid voluntarily and not under any duress. A plea of *res adjudicata* was also filed, upon the theory that the prior adjudication definitely settled all issues. The chancellor held the plea of *res adjudicata* good, that the allegations in the answers were supported by the evidence, and entered a decree dismissing the bill for want of equity. This court, in affirming the decree of the chancellor anent the new averments and the plea of *res adjudicata,* held that the facts tended strongly to prove that the tax payments were made voluntarily despite the making of protests by the company. We concluded that the averments of promises by the company to return to customers their *pro rata* share of the tax money recovered were insufficient to show an obligation on the part of the company to return any of the tax money paid in by it.

The plea of *res adjudicata* was held good by this court, as the issues involved were settled in the prior cases and the new averments and evidence thereon were not of such character as to require a different conclusion.

The last *Standard Oil Co. case,* in volume 348 of the Reports, has been considered in some detail because the complainant here argues energetically that the former rule laid down cannot be applied here on account of the great difference in material facts. We must admit that a material difference in facts exists in the present case distinguishing it from the former cases cited. This difference in facts bears directly upon the question whether the payments made by the complainant were made voluntarily or under duress. The evidence here established the fact that the complainant and its customers, who have a direct and substantial interest in the present action, arrived at the common conclusion that the motor fuel tax was to be collected under a law which they believed to be invalid; that the future acts of the complainant respecting the collection and payment of the tax were based upon that common belief, and that a definite agreement was arrived at by the complainant and its customers that the complainant would pay the tax until the law had been definitely adjudicated and found invalid. Pending this determination the complainant was confronted with the problem of either paying the tax, protesting the payment and seeking through legal means to have the taxes so paid refunded to it in order that the tax money so collected could be returned by it in full to its customers, or of suffering a very material and substantial loss of business by the loss of those customers who said the complainant must absolutely protect them in the payment of the tax or suffer the loss of their business. That this potential loss was no figment of the imagination but was a hard, cold business fact the evidence abundantly discloses. The complainant agreed with the interested customers to protect them at its own expense, so that they

would suffer no loss if the law were declared invalid. This situation differs greatly from the facts in the last cited *Standard Oil Co. case,* because the latter company was not by action of its customers compelled to agree to protect them against loss or suffer the loss of their trade. Another vital difference between the facts of the two cases arises because the complainant · kept an accurate record of the names and addresses of its customers who paid tax money to it, together with the number of gallons of motor fuel purchased by each customer and the amount of tax paid thereon. In the *Standard Oil Co. case* it does not appear that any such record was kept. Furthermore, it must be kept in mind that the complainant's record was compiled in order that it would be able to make full and proper returns of tax money in the event the money was returned to it by the State. This makes it plain that in the present case the compilation of the record was the outgrowth of the agreement between the complainant and its customers.

An examination of authorities in order to ascertain just what is necessary to constitute an involuntary payment of a tax because of duress, discloses certain well settled legal principles which are applicable to and govern the decision in this case. It is not necessary that the party paying the tax be in physical danger, or that he be actually placed in a position that his property is about to be seized in satisfaction of the tax, or that his back be to the wall, so to speak. (*Chicago and Eastern Illinois Railway Co.* v. *Miller,* 309 Ill. 257.) That case clearly held to the well known rule that a person who accepts the benefits of a statute is generally barred thereafter from challenging its validity, provided no question of public policy or public morals is involved; but where there is an involuntary acceptance of the statutory provisions, or where money is paid under the pressure of severe statutory penalties or to avoid disastrous effects to business, the payment is involuntary and money paid may be recovered. (*Union Pacific Railroad*

*Co.* v. *Public Service Com. of Missouri,* 248 U. S. 67.)
Virtual or moral duress is sufficient to prevent a payment
made under its influence from being voluntary. (*Robert-
son* v. *Frank Bros.* 132 U. S. 17, 33 L. ed. 236.) Where
such duress is exerted under circumstances not justified by
law it need only be sufficient to influence the apprehensions
and conduct of a prudent business man. If the duress is
exerted by one clothed with official authority or who is ex-
ercising a public employment, less evidence of compulsion
or pressure is required. Justice Holmes, speaking for the
court in *Santa Fe Railway Co.* v. *O'Connor,* 223 U. S. 280,
56 L. ed. 436, said: "It is reasonable that a man who de-
nies the legality of a tax should have a clear and certain
remedy. The rule being established that, apart from spe-
cial circumstances, he cannot interfere by injunction with
the State's collection of its revenues, an action at law to
recover back what he has paid is the alternative left. Of
course, we are speaking of those cases where the State is
not put to an action if the citizen refuses to pay. In these
latter cases he can interpose his objections by way of de-
fense, but when, as is common, the State has a more sum-
mary remedy, such as distress, and the party indicates by
protest that he is yielding to what he cannot prevent, courts
sometimes, perhaps, have been a little too slow to recognize
the implied duress under which payment is made."

The evidence for the complainant demonstrated that the
Director of Finance intended to take, and did take, all nec-
essary steps to collect the tax imposed on motor fuel re-
gardless of all questions then raised as to the invalidity of
the law. The necessary forms were prepared and sent to
all distributors in the State by employees in his office. No
indication or hint, according to the record, was ever given
out that the law would not be enforced. We regard as
unimportant the argument advanced that the Director of
Finance did not make any threats or coerce anyone into
paying the tax. The statute designated and empowered that

official to collect the tax. The penalties for non-payment of the tax were not formulated as rules and regulations by the directors; they were part of the statute, so that the statute—not the director—was proclaiming the penalties to the motor fuel distributors of the State. The distributors had every right to indulge in the legal presumption that an officer of the State would live up to his oath of office to perform the duties imposed upon him by law. The evidence disclosed actions on the part of the Director of Finance of such character as to constitute duress well within the rule laid down in the cases above cited.

The complainant, upon a recovery of the tax money, is in a position to do equity to its customers. It has a complete record by which it can make full and accurate refund of the money. No such record was preserved in the last *Standard Oil Co. case, supra,* for there the company could only offer to refund if it had on record a protest of a customer. Furthermore, it did not offer to refund the whole tax paid by a customer, as the expense incurred in recovering the money was to be first deducted and the balance divided *pro rata.* In that case there was a failure of the company to definitely aver and prove how much of a refund its customers would receive, if any at all, while in the present case there was shown the existence of a positive enforcible agreement to refund the tax in full, without deduction of the three per cent provision for evaporation and other losses or of deductions to pay for the expenses of recovery. From the evidence it is apparent that the complainant is acting for the benefit of its customers as well as for itself.

Section 2 of the Motor Fuel Tax act of 1927 required the distributor to take out a license to act as such. Section 3 required the distributor to inventory all motor fuel on hand on August 1, 1927. Section 4 required the making of reports or returns by the distributor to the Director of Finance. Section 5 required the licensee (who was, of

course, the distributor,) to pay the tax of two cents a gallon. The law was silent as to how the distributor should be reimbursed for the tax money paid. No one blinded himself to the fact that the consumer was the ultimate taxpayer. But should the distributor fail to collect the tax from a customer it made no difference to the State, as it looked to the distributor, only, for the tax. We therefore cannot escape from the fact that, so far as the State was concerned, the distributor paid the tax. Sections 1, 2 and 2a of the "Act in relation to the payment of the public money of the State into the State treasury," (Smith's Stat. 1927, chap. 127, pars. 170, 171, 172,) have a bearing upon this question, as section 2a of that act required the Director of Finance or other State officer, etc., to hold all moneys received under protest for thirty days and to deposit the same in the State treasury on the expiration of such period unless the protesting payor shall, within the thirty-day period, file a bill in chancery and secure a temporary injunction restraining the making of such deposit. The tax money in question was paid to the Director of Finance by the complainant, which, under the act mentioned, was the "party making such payment" for the purpose of filing the bill in chancery and securing the temporary injunction. The evidence precludes any other view but that the complainant paid the tax, and, under the statute last cited, was the proper party to file the bill in chancery seeking a refund and a temporary injunction.

The defendant contends that if a customer is entitled to recover the tax money held by the Director of Finance, the customer is a necessary party and must file a suit in his own behalf. The defendant also argues that the customer had no contact with the Department of Finance, and the only claim for reimbursement available to the customer would be against the complainant. These arguments conflict and repel each other. It must be obvious that if a customer has no contact with the Department of Finance he

would have no claim against it and could therefore file no suit against it for recovery of his money. The customers could not be made parties to this suit in any capacity, because section 2a of the statute under which these proceedings were instituted precludes recovery by any other than the one who paid the money under protest to the State, and then only in case the "party making such payment shall within such period [thirty days] file a bill in chancery and secure a temporary injunction restraining the making of such deposit." It is stipulated in this case that complainant sent its check "as payment of the tax," and the answer of defendant also admits that "complainant paid to said department, as and for such tax, the said sum of $24,268.90."

Under the facts of this case and the law applicable thereto we must hold that the then Director of Finance, or his successor in office, is in control of money that in equity and good conscience he has no right to retain, inasmuch as the avenue for the return of the tax money in full to the customers of complainant, without any deductions, is straight and broad. The presence of the customers as necessary parties to the suit is not indispensable to a decision of this case upon its merits. A final decree may be rendered by the chancellor upon the reversal of this decree and the remandment of the case, which will adequately protect and conserve the individual interests of each of the complainant's customers. The legislature intended that taxes paid under duress and compulsion may be recovered in the manner directed by statute. To contend that this litigation is an endeavor to give to customers indirectly what the law does not give directly is only to say that the interests of the customers are such that this suit cannot prevail, which in this particular instance would mean that the customers would lose. Such a decision would violate equity and good conscience, as by it the State would receive and retain money illegally collected under an un-

constitutional law by resting its right on a technicality and not upon the basic principles of justice.

The decree is accordingly reversed and the cause is remanded to the circuit court of Sangamon county, with directions to ascertain the character of the fund litigated and in whose custody it now reposes, to determine the extent of liability therefor of the Director of Finance and his successors in office, and to make such other findings and orders in relation thereto as circumstances may require and to the court shall seem proper, including a final decree ordering re-payment to complainant of the sum to which it is entitled. *Reversed and remanded, with directions.*

Mr. JUSTICE STONE, dissenting:

I am unable to concur with the majority opinion rendered in this case. There is in my opinion no distinction in principle between this case and previous cases decided by this court. A distinction is sought to be made between the present case and *Standard Oil Co.* v. *Bollinger,* 348 Ill. 82. In each case the claimant had an agreement with its customers that should it secure the return of the money it would re-pay them. The manner of re-payment, though differing somewhat, was the same so far as it could affect the principle involved here. In the case before us the customers were named, while in the *Standard Oil Co. case* they were not. Such a difference can in nowise affect the rule of law which should govern. In neither case did the complainant pay out its own money but paid merely the money paid to it by customers who did not protest and who paid the money for the purpose of meeting the tax.

The majority opinion finds that duress existed because of the necessity that the tax be paid to avoid loss of business. The only agreement shown by the evidence was that the complainant would seek the return of the tax. It paid out nothing of its own because of this arrangement except the expense of litigation. It does not seek the return of

that expense. These customers, who the majority opinion finds have a direct and financial interest in the present action though they are not made parties to it, did not exact of the complainant that it pay this tax out of its own funds. The fact is that it paid the tax with funds collected from them. If there was any duress at all it resulted not in the payment of the tax by the complainant but in an agreement to prosecute this suit. If it did not win it was to pay nothing to its customers. For business reasons it agreed to give its services to seek the return of this tax for them. In my opinion this case is in nowise distinguishable from the *Standard Oil Co. case.*

The bill prays that the money be returned to complainant for the use of persons who contributed it. This does not meet the requirements of the rule governing the repayment of money paid under duress, but is, on the other hand, an admission that complainant has no right to this fund and has not paid it under duress. The majority opinion cites no case holding that a payment made under circumstances appearing here constitutes a payment under duress and I know of none. An examination of the cases previously before this court will disclose, either by the evidence or by the bill filed, quite as much compulsion on the complainants there seeking to recover moneys claimed to have been paid under duress as can be inferred from the facts of this case, and yet in all those cases this court has consistently denied recovery. (*Standard Oil Co. v. Bollinger, supra; Illinois Merchants Trust Co. v. Harvey,* 335 Ill. 284; *School of Domestic Arts v. Harding,* 331 id. 330; *Illinois Glass Co. v. Chicago Telephone Co.* 234 id. 535; *Yates v. Royal Ins. Co.* 200 id. 202; *Swanston v. Ijams,* 63 id. 165; *Stover v. Mitchell,* 45 id. 213; *Elston v. City of Chicago,* 40 id. 514.) The rule laid down in those cases has been consistently adhered to until the present majority opinion, which in my judgment is a radical departure therefrom. The rule heretofore followed in this

State is also the rule of other jurisdictions. In *Chesebrough* v. *United States,* 192 U. S. 253, where an attempt was made to secure a refund of the sum expended in the purchase of revenue stamps from a collector, the court states as the general rule that "even a protest or notice will not avail if the payment be made voluntarily, with full knowledge of all the circumstances and without any coercion by the actual or threatened exercise of power possessed or supposed to be possessed by the party exacting or receiving the payment over the person or property of the party making the payment, from which the latter has no other means of immediate relief than such payment." The rule was again so stated in *United States* v. *Cuba Mail Steamship Co.* 200 U. S. 488.

In this case, though it be conceded that complainant was under duress of some sort, it clearly cannot be said to have arisen from threats or coercion of the one to receive the tax, but the so-called duress admittedly arose out of threats of customers who were not the payees of the tax but were to pay it. Such a case is clearly without the rule followed by this and other courts. There is nothing like it in the books. It seems clear to me that the majority opinion opens the door to fraudulent claims of duress professedly exercised by others than the one who is demanding the payment. It is to my mind a novel proposition of law that one may recover as a payment under duress a tax paid because the payor considers it good business to agree with third parties whose money actually paid the tax to pay it and to bring suit to recover it for them. Complainant here was in nowise under any form of duress recognized in the law. It has no interest in the fund here involved and there is no one before the court who has.

In my opinion the decree of the circuit court should be affirmed.

Mr. Justice DeYoung, also dissenting.