RAINTREE HOMES, INC., *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. THE VILLAGE OF LONG GROVE, Defendant-Appellant and Cross-Appellee.

Second District   No. 2—06—1105

Opinion filed April 15, 2009.—Rehearing denied May 19, 2009.

BOWMAN, J., concurring in part and dissenting in part.

Robert T. O'Donnell, of Eiden & O'Donnell, Ltd., of Vernon Hills, for appellant.

Margaret Morrison Borcia, of Morrison & Morrison, P.C., of Waukegan, for appellees.

JUSTICE JORGENSEN delivered the opinion of the court:

Plaintiffs, Raintree Homes, Inc., and Raintree Builders, Inc. (collectively, Raintree), filed a one-count amended complaint against defendant, the Village of Long Grove (Village), seeking: (1) a declaratory judgment as to the validity of Village ordinances requiring the payment of impact fees to the Village as a condition of obtaining building permits; and (2) a refund of the impact fees it paid to the Village

for 19 homes it built there between 1993 and 1997. Following a bench trial, the trial court found the Village's ordinances unenforceable and rejected the Village's affirmative defenses. Accordingly, it entered judgment in Raintree's favor and awarded Raintree $114,700. The Village appeals from that order.

Raintree subsequently moved for modification of the judgment order, seeking prejudgment interest on the impact fees it had paid to the Village. The trial court denied Raintree's motion. In its cross-appeal, Raintree appeals the denial of its motion.

We affirm.

## I. BACKGROUND

Section 4—1—4(B) of the Village's code sets forth that, "as a condition of the issuance of a building permit for the construction of a dwelling unit, the building permit applicant shall be required to donate monies to the Village." Long Grove Municipal Code §4—1—4(B) (amended June 25, 1996). The monies, or impact fees, are for the benefit of the school districts and for the acquisition, maintenance, preservation, and operation of open space in the Village. Long Grove Municipal Code §4—1—4(B) (amended June 25, 1996).

Section 4—1—4(A) of the Village code provides:

"Purpose: During the past ten (10) years, the school districts operating within the jurisdiction of the Village have experienced a population increase due principally to the subdivision of vacant land, both within and without the jurisdiction of the Village, and planning studies have indicated that such population growth will accelerate within the next ten (10) years, resulting in the rapid disappearance of available land and the marked increase in land values. It has further been determined that helpful productive community life depends in part upon the availability of recreational park space and adequate school facilities, and, further, that new subdivisions and new houses automatically generate more pupils for the school districts within the Village, and that, finally, it has been determined that the influx of pupils is not compensated for by a corresponding increase of tax revenue for the Village or the school districts as a direct result of the building of residences for a substantial period of time up until the township assessors have modified the property assessment to correspond with the increased value of the property, and, during this same interval, it has been determined that school districts and villages provide services to the owners or occupants of these properties by way of educating the children and providing Municipal services, and it has been further determined that the available open space in the Village is shrinking at a rapid pace due to the construction of residences within the Vil-

lage. It has been a consistent policy of the Village to preserve open space whenever possible, and it is essential in doing such to acquire monies to finance the purchase and maintenance of open spaces, and it has further been the policy of the Board to attempt to assist school districts in their financial straits whenever possible and to cooperate with the school districts to secure adequate funding to satisfactorily educate students from the new residences located in the Village." Long Grove Municipal Code §4—1—4(A) (1979).

Specifically, Village Ordinance 89—O—23, entitled "An Ordinance Amending the Building Code in Reference to the Designation of School Districts for Contributions" and adopted on July 11, 1989, amended sections 4—1—4(B)(1) and 4—1—4(B)(2) of the Village's code. Village of Long Grove Ordinance No. 89—O—23 (eff. July 11, 1989). As amended, the code required a building permit applicant to pay to the Village $1,200 per permit for the elementary school district, and $500 per permit for the high school district, in which the property for which the permit is sought is located. Long Grove Municipal Code §§4—1—4(B)(1), (B)(2) (1989). The total impact fees were, therefore, $1,700 per building permit. The school impact fees "(as adjusted by the formula on file with the Village Administrator) shall be forwarded by the Village to the appropriate" elementary or high school district "for its general operation fund at the time of issuance of a certificate of occupancy. This payment is designed to partially reimburse the school districts for expenditures made on behalf of new pupils from new residences within the Village." Long Grove Municipal Code §§4—1—4(B)(1), (B)(2) (1989).

Ordinance 93—O—13, adopted on April 27, 1993, amended section 4—1—4(B)(3) of the Village's code. Village of Long Grove Ordinance No. 93—O—13 (eff. April 27, 1993). As amended, the code required the payment of impact fees from a building permit applicant in the amount of $2,600 per permit to the Village's general fund and was "designed to enable the Village, with these moneys, to acquire, maintain, and preserve open space in the Village." Long Grove Municipal Code §4—1—4(B)(3) (1993). Four hundred dollars of the impact fees were allocated to the Long Grove Park District "to assist in the acquisition, maintenance, and preservation of open space within the Village, and for the general operational expenses relating thereto." Long Grove Municipal Code §4—1—4(B)(3) (1993). The open space fees, coupled with the school fees, raised the total impact fees per building permit to $4,300.

Ordinance 94—O—11, adopted on July 12, 1994, raised the impact fees for the school districts to $2,500 for the elementary school district and to $1,500 for the high school district. Village of Long Grove

Ordinance No. 94—O—11 (eff. July 12, 1994). It also raised the open space fees to $3,300, of which $800 was allocated to the Long Grove Park District. Village of Long Grove Ordinance No. 94—O—11 (eff. July 12, 1994). The 1994 amendment, thus, raised the total impact fees to $7,300 per building permit.

Raintree filed its amended complaint on July 14, 2000. Raintree alleged that, between February 1993 and August 1997, it entered into contracts to build homes in the Village, a non-home-rule municipal corporation. To obtain the building permits, Raintree was required to pay certain impact fees. Between August 15, 1988, and March 24, 1997, Raintree obtained 43 building permits from the Village. In its complaint, Raintree sought a refund of the impact fees it paid for 19 permits issued to it by the Village from August 1993 through March 1997. Pursuant to the Village's code, the impact fees between March 1993 and June 24, 1994, were $4,300 per permit. Raintree paid the fees and obtained eight building permits from the Village. Between June 26, 1994, and February 1998, the Village's impact fees were $7,300 per permit. Raintree paid the fees and obtained 11 permits.

Raintree further alleged that, under the contracts it entered into with certain purchasers, it was required to deliver completed homes to them within a specified time. It made verbal commitments to other purchasers to deliver completed homes within a specified time. Raintree alleged that it purchased lots in the Village upon which it constructed "spec" homes. Raintree secured mortgages to purchase the lots. In 1994, Raintree applied for and received building permits for the construction of "spec" homes on three lots in the Village. It paid $4,300 each for two of the permits and $7,300 for the third permit.

Raintree further alleged that the Village has statutory authority to establish reasonable requirements as to school grounds and may, under sections 11—12—5 and 11—12—5.1 of the Illinois Municipal Code (65 ILCS 5/11—12—5, 11—12—5.1 (West 2000)), require that a subdivider dedicate land or make a cash contribution in lieu of land for new schools as a condition of the Village's acceptance of a plat of subdivision. Raintree argued that the Village's required donation to the elementary and high school districts for issuance of a building permit did not constitute a cash contribution in lieu of a dedication of land for new schools, but was purportedly for the districts' general operation funds.

In its answer, the Village asserted several affirmative defenses, including estoppel, failure to add necessary parties, the voluntary payment doctrine, and the pass-on defense.

## A. Edward Brown

The bench trial commenced on March 13, 2006. The testimony focused on the Village's affirmative defenses.

Edward Brown, president of Raintree, testified that Raintree builds upper-end, semi-custom, and custom single-family homes. Raintree Builders, Inc., was incorporated in 1978 and initially conducted business in the Naperville, Bartlett, Hinsdale, and Burr Ridge areas. Raintree Homes, Inc., was incorporated in 1986, when Brown decided to expand his business to the Village and the Kildeer and Barrington areas. He took on as a partner Chuck Eckert. Eckert was president of Raintree Homes, Inc., and Brown was vice president and treasurer. According to Brown, he oversaw the operation and assisted Eckert in the day-to-day operations and trained him to run the business. Raintree was not a subdivider or developer in the Village. It purchased lots from entities that had already developed and subdivided lots.

Raintree obtained its first building permit from the Village on August 15, 1988. Brown testified that all but one of the building permits at issue in this suit were paid for by Raintree Homes. From 1993 through 1997, Brown and Eckert set the base prices for the homes Raintree built in the Village. They considered the costs in the area and the price the market was capable of supporting. The base prices included the cost of building permits, but excluded impact fees. Brown stated that he was unaware if other villages charged impact fees as part of their building permit fees. Raintree did not have different base prices for different municipalities. Between 1993 and 1997, 90% of Raintree Homes's business was conducted in the Village. Raintree did not build in other municipalities because it had "substantial commitments in land" in the Village and because the market was in the Village. Brown explained that Raintree purchased some Village lots as part of a package deal.

Brown further testified that Eckert set the specific prices for the homes and dealt with customers in selecting homes. However, the base prices and the prices for extras were set by Brown and Eckert before Eckert met with customers. Extras or allowances were specified in the contracts. Although Brown was familiar with the components of the contracts, he was unaware if Eckert prepared a formal price list for each contract.

Brown explained that Raintree would sometimes sell an entire package to a client—the land and the home. In cases where it sold the land, Raintree financed the purchase through a mortgage or a line of

credit.[1] Raintree paid principal and interest on the lot until it transferred the package to its customer. According to Brown, the longer Raintree held onto a piece of property, the less profit it made on it. Brown conceded, however, that Raintree closed on the purchase of certain lots after it signed construction contracts with home buyers. Between 1993 and 1997, some agreements specified the date on which Raintree was to deliver a finished product. In other cases, Raintree gave customers a verbal commitment as to the completion date. Typically, Raintree gave a six- to eight-month commitment.

Brown explained that, for the period 1993 to 1997, Raintree determined the purchase price that it charged its customers by setting a base price and then charging for certain changes such as three-car garages, concrete driveways, skylights, and extra outlets. The base price was set by using "an average of what a home could [sic] cost over the prior period of time." This included any costs for building permits, but excluded impact fees. Building permit costs included other fees charged by villages, inspection costs, review costs, and certain other costs. According to Brown, every town in which Raintree conducted business charged a building permit fee. He explained that, once the base price was determined, it did not change once the actual cost was computed. Therefore, some circumstances resulted in Raintree absorbing costs, such as broken windows, stolen equipment, and misestimations of excavation costs. He testified that the base price of a home changed over time depending on cost changes, such as in the cost of lumber. Brown also stated that Raintree would not increase its base price if a realtor were involved in a sale. Raintree paid the realtor's commission and did not pass it on via the purchase price.

With the exception of several transactions not at issue in this suit, Raintree never passed on the impact fees to its customers because Brown desired to remain competitive (i.e., "a bit" under the market) in terms of Raintree's pricing and because he did not believe that the impact fees were attributable to the building process. Brown stated that Raintree, therefore, made less profit than it normally would have made. Specifically, when Raintree determined the base prices of its homes and estimated the building permit fees, it did not factor in impact fees. Brown did not write "[p]aid under protest" on the checks written to the Village for the fees because he did not believe that the Village would accept the checks if they included that language. In cases where Raintree passed on the impact fees to its customers, the contracts were clear that the fees were being passed on.

---

[1]Of the 19 lots for which Raintree sought a refund of impact fees, Raintree owned 13 lots and its customers owned 6 lots.

According to Brown, the Village did not have the authority to charge the impact fees as a condition of obtaining a building permit. He paid them because, if his business had been unable to obtain the permits, it could not have built homes in the Village and would have gone out of business. Also, Brown stated that he would have been in breach of his contracts with his customers and his reputation would have suffered.

Brown considered filing a lawsuit to challenge the fees, but decided against it because of the time involved in litigating the matter and the fact that he would not be building in the Village while the litigation was pending. Brown also stated that a two-year delay in building would "probably" have put Raintree out of business. According to Brown, of all the municipalities in which Raintree conducted business between 1993 and 1997, the Village was the only one that charged impact fees. He conceded, however, that Raintree was doing business in Kildeer between 1993 and 1997 and was assessed impact fees to be paid at the time of the issuance of any building permits. In March 1996, Kildeer charged $700 in impact fees, whereas the Village charged $7,300. Brown further conceded that Raintree Homes sued Kildeer to recover impact fees it had paid during the period that is the subject of this suit.

Raintree's contracts provided that it was Raintree's obligation to pay for the building permits. Everything Raintree charged its customers was listed on the contracts. In cases where impact fees were charged to the customers, the charge was noted as an allowance and it was reflected in the closing statement as a miscellaneous calculation.

Addressing the Village's request for Raintree's profit and loss statements, Brown testified that he produced everything in his possession and that a computer that contained some of this information had crashed and, so, he was unable to provide all statements. Raintree's routine practice was that it would not retain every document in a customer file. Eckert reviewed the files and threw away what he thought was unnecessary. Nothing was thrown out intentionally to hide something in this litigation. Of the statements Raintree produced, none of the jobs were located in the Village; they related to construction in Kildeer. The statements that were lost contained information concerning contract prices, lot prices, total costs of construction, and realtors' fees. They also contained the profit margins on the foregoing items. The statements did not contain information concerning whether Raintree paid impact fees.

Addressing the job cost estimate document for Lot 3 of the Bridgewater Farms development, one of the subdivisions at issue, Brown testified that the permit cost was $8,358, which included a $1,000

refundable bond. Subtracting the refundable bond, Brown conceded, would yield a number that was "close" to the actual permit cost incurred for that lot, which was $7,300.

After Eckert retired, Brown became president of Raintree Homes and created the price workups for the contracts he negotiated, including Lots 11 and 22 in the Stonehaven development and Lot 8 in the Edgewater Pond development. Brown attached to the contracts the price workups, which contained all of the elements of the contracts' pricing. Eckert did not attach his workups to the contracts, but the information was in the contracts. Reviewing price workup sheets and certain purchase contracts that he prepared, Brown conceded that the total price in the workup sheets equaled the total contract purchase price.

Brown explained that a job cost estimate is a cash flow estimate for the company and is prepared after the contract is signed. According to Brown, he had lines of credit with banks, and Eckert had lent Raintree money. The job cost estimates were produced because Brown desired to know how much money the company needed to build a home and the liquidity of its available funds. According to Brown, the job cost estimate—the "estimate[ ] of any cash that we were going to have to put out during the construction" of a home—had "nothing to do with the price we charged the customer." When a job cost estimate noted a price of $7,500 for a building permit, Raintree paid that amount to obtain the permit; it did not charge that amount to the customer. The job cost estimate also contained anticipated profit. A sworn contractor's statement, according to Brown, is an estimate of what Raintree paid a subcontractor to perform a particular job. It does not denote that the customers were charged the fees. The sworn contractor's statements and job cost estimates reflected the impact fees because Raintree paid those fees. Raintree did not raise its home prices to include the impact fees and pass them on to its customers.

## B. David Lothspeich

David Lothspeich, the Village's manager, testified as an adverse witness for Raintree. Addressing the Village's March 1991 zoning map, Lothspeich identified the subdivisions at issue in this case: Bridgewater Farms, Briarcrest, and Stonehaven. He further identified on the map certain areas designated as open space within the foregoing subdivisions. The open space areas were deeded to the Village as a condition of approval of the plat of subdivision for each subdivision. Addressing the plat of subdivision for Briarcrest that was approved by the Village, Lothspeich testified that there are conservancy easements within the plat and that there is a provision that all areas designated

as conservancy district or scenic corridor on the plat must be maintained in their natural, undisturbed condition and that no man-made structures shall be constructed thereon. As to the Stonehaven subdivision, Lothspeich stated that, as a condition of plat approval, the Village required that certain conservancy easements be dedicated to be kept as open space. The ordinance approving the plat required that conservation district areas and scenic corridor areas in Stone-haven be conveyed to the Village for open space. Similar requirements were included in the ordinance approving Bridgewater Farms.

Lothspeich further testified that the Village had a procedure whereby it would determine, based on soil types, which areas in a proposed plat of subdivision were worthy of being protected as open space. By code, there are various conservancy soils that are to be preserved. The Village required either a dedication to the Village or a conservancy easement or district. In other words, the Village had a procedure at the time of plat of subdivision to preserve the open space that it deemed worthy within the subdivision.

According to Lothspeich, impact fees are determined based on the number of lots. They are not related to any considerations of open space. They are related to two separate processes: zoning and building.

Lothspeich further testified that the impact fees at issue in this case were disbursed to the agencies for which they were collected, including the elementary school district, the high school district, and two park districts. A portion of the fees was retained by the Village and deposited into its general fund. The amount deposited into the general fund was for the acquisition, maintenance, and preservation of open space. For example, when the permit fee totaled $7,300, $2,500 was deposited into the Village's general fund. According to Lothspeich, there were no objections filed protesting the impact fees at issue in this case.

## C. Charles Eckert

Charles Eckert testified that he was president of Raintree Homes from 1986 to 1997. He owned 49% of the shares in the company, and Brown held the remaining 51% of the shares. Eckert testified that Raintree Homes built about 12 to 19 homes per year. Raintree did business in southwestern Lake County, including Barrington, South Barrington, Hawthorn Woods, Kildeer, the Village, and Vernon Hills. Raintree did about one-third of its business in the Village. While he was with the company, the majority of its homebuilding was conducted in Kildeer. Eckert's recollection was that, of all the towns in which he did business, the Village was the only one that charged impact fees.

Eckert explained that Raintree Homes was a home builder or general contractor, as opposed to a developer or subdivider. Raintree Homes did not take undeveloped tracts of land, subdivide them into lots, and then build homes on the lots for its customers. Rather, Raintree Homes built homes on lots that its customers owned, or it built on lots that it owned and later sold to its customers with the homes. Raintree Homes did not keep a sizable inventory of lots. Its inventory ranged from 6 to 25 lots at any given time.

Eckert was responsible for obtaining building permits from the Village between 1988 and 1993. He was aware that one of the elements of the building permit fee was the impact fee, which was also called a subdivision fee or an interagency fee. According to Eckert, building permit costs, but not impact fees, were included in the base price of each model. Raintree Homes's base price was the same from community to community. Each community charged a different building permit fee. Although Raintree Homes did not adjust its base price to reflect the different fees, the base price contained an estimated cost of the building permit: "A cost for building permit fees was included in the base price as any other commodity, [sic] lumber, concrete, whatever." If the building permit fee in any community was higher than the estimate used to calculate the home's base price, the company's "bottom line" would be reduced by that amount.

Addressing target profits, Eckert stated that Raintree Homes had a benchmark of 8% to 10% profit before taxes and after operating expenses. Eckert had primary responsibility for negotiating individual contracts with customers on behalf of Raintree Homes and signed the contracts on the company's behalf. Eckert created a price workup for each home by meeting with the customer. He started with the brochure price of the home. If the customer wanted to make any changes, Eckert utilized an options price list. He wrote out in longhand all of the changes and arrived at a final price, including the allowances. Addressing sworn contractor's statements, Eckert testified that they were generated for the closing on the home, as required by the title company.

The sheets that listed costs were not related to the pricing of the homes. The pricing occurred after the contracts were signed. Eckert explained that there is a difference between the cost that Raintree Homes paid to construct a home and the price it charged its customer. Raintree Homes would not merely add up its costs and then add a certain profit to the figure to arrive at its selling price.

## D. Mark Perlman

Mark Perlman, president of Empeco Custom Builders, testified as an expert witness that he started his company in 1982. Empeco is a

custom builder that builds 9 to 10 custom residential homes per year in the north and northwest Chicago suburbs. Perlman's company has also developed subdivisions. The price range of Empeco's homes, without land, is $600,000 to $1.5 million. Empeco has built homes in the Village and in Kildeer. As to the Village and Kildeer, Empeco has not been a subdivider or developer; it has conducted business in those communities only as a builder.

Perlman opined that, based on industry practice and standards, permit fees and impact fees are typically included in the home prices and are passed on to buyers. Empeco passes on permit fees to its buyers. The fees municipalities charge vary, and the components of those fees vary from municipality to municipality. In addition to building permit fees, municipalities may charge school fees, open space fees, sewer and water fees, library donations, and park donations.

Perlman reviewed Raintree's documents and opined that Raintree passed along the permit and impact fees to its homebuyers. Perlman explained that he reviewed documents concerning six or seven Raintree homes, including workup sheets and job cost estimates. Some contracts showed allowances that included building permit fees (including the impact fees). Perlman did not bring the documents to trial and, therefore, could not specifically identify the lots. Perlman further opined that Raintree included permit fees on its workup sheets and knew from the outset that the Village charged such fees. Also, Perlman noted that Eckert admitted in his deposition that the permit fees were passed on. Perlman further opined that Raintree would not be at a competitive disadvantage in the Village, so long as the Village uniformly applied the permit fee requirement to all builders.

### E. Drew Pederson

Drew Pederson, an urban planner, testified that he has worked in his field for about 25 years. Pederson reviewed the Village's 1979 and 1991 comprehensive plans. The plans' stated goals and objectives for open space in the Village include: character, recreation (particularly water resource management), and wildlife habitat corridors. Other than those expressed in the comprehensive plans, Village land use regulations that preserve open space include the zoning ordinance and the subdivision ordinance. Pederson testified that the Village has a conservancy ordinance that was enacted in 1974, which provides that development is precluded in lowland or upland areas with specific soil types and slopes. Its purpose is to protect areas for recharge of the wells that provide water to the Village's residents. Pederson explained that the Village relies on shallow wells for all of its water, that the wells recharge from rainwater that seeps into the ground and into the wells, and that the water must be kept in the Village.

Pederson further testified that the Village also has a scenic corridor easement ordinance, enacted in 1978, that yields 200 feet on each side of major roadways, and 100 feet for other roads, to contribute character to the Village and to allow seepage of rainwater into the ground.

Pederson opined that the Village is a unique open space community and that a homeowner receives greater value for his or her home because of the preservation of open space for its visual, water preservation, and green infrastructure (*i.e.*, preventing residential flooding) characteristics. Pederson further opined that the Village does not require impact fees to be paid when plats of subdivision are approved.

## F. Trial Court's Ruling

On July 21, 2006, the trial court found that the Village exceeded its authority in enacting the ordinances imposing the impact fees and determined that the ordinances were, therefore, unenforceable and the fees collected invalid. It entered judgment in Raintree's favor in the amount of $114,700.

Specifically, addressing the school impact fees, the trial court found that the fees were void because the Illinois Municipal Code (65 ILCS 5/1—1—1 *et seq.* (West 2000)) prohibits a cash donation for general operations, as opposed to school grounds. In addition, the court determined that the exaction did not satisfy the requirement that it be specifically and uniquely attributable to the development because it applied to every house and was not adjusted based on the developer's activity.

Addressing the open space impact fees, the trial court found that the fees were solely revenue oriented and that there was no evidence that the Village ordinances considered anything individual to the construction at issue in order to satisfy the requirement that they be specifically and uniquely attributable to the developer's activity. Furthermore, the trial court found impermissible the ordinances' provisions for the maintenance and preservation (in addition to acquisition) of open space. The court read the Illinois Municipal Code to prohibit cash fees for the purpose of maintaining and preserving existing open space under the guise of the Village's police power because existing open space is not specifically and uniquely attributable to the instant development activity.

Next, the trial court addressed the timing of the exaction of the impact fees, finding that exaction of the fees at the time of the building permit issuance is a necessary implication of the authority to impose fees at the time of subdivision.

Addressing the Village's affirmative defenses, the court found that Raintree did not pass on the impact fees to its customers. The court noted Brown's and Eckert's testimony that the price of each model home was the same regardless of municipality and, therefore, Raintree's profits in the Village were reduced by the amount of the impact fees. Turning next to the Village's voluntary payment and estoppel defenses, the court found that the impact fees were paid under duress because there was a business compulsion to pay them. The court further found that Raintree would have been financially damaged if it had conducted business only in other towns. Thus, its only commercially reasonable course of action was to pay the impact fees in order to obtain the permits. Further, in finding that the payments were involuntary, the court rejected the Village's estoppel defense.

Finally, the court addressed the Village's contention that Raintree failed to add the school and park districts as necessary parties to the suit. The court found that these entities did not have a material interest in the controversy because they did not have fee-setting authority with respect to the impact fees.

Raintree moved for modification of the judgment order to include prejudgment interest. On October 26, 2006, the trial court denied the motion. The Village timely appeals from the trial court's July 21, 2006, order, and Raintree cross-appeals from the denial of its motion seeking prejudgment interest.

## II. ANALYSIS

### A. The Village's Appeal

#### 1. Validity of Ordinances

In its appeal, the Village argues first that it did not exceed its authority under section 11—12—5 of the Illinois Municipal Code when it enacted a series of ordinances requiring the payment, upon issuance of a building permit, of impact fees for schools and open spaces. The Village contends that the trial court erred in finding that its school and open space impact fees were invalid and asserts that the court misapplied the rules governing statutory and ordinance construction.

In construing a statute, a court must ascertain and give effect to the legislature's intent in enacting the statute. *General Motors Corp. v. State of Illinois Motor Vehicle Review Board*, 224 Ill. 2d 1, 13 (2007). The statutory language is the best indication of the drafters' intent, and the language should be given its plain, ordinary, and popularly understood meaning. *Alvarez v. Pappas*, 229 Ill. 2d 217, 235 (2008). When the question presented is one of statutory construction, our review is *de novo*. *Alvarez*, 229 Ill. 2d at 235.

■ When we construe the validity of a municipal ordinance, our analysis is guided by the same standards applicable to statutes. *City of Chicago v. Morales*, 177 Ill. 2d 440, 447 (1997). "The validity of the ordinance is to be tested, neither by the principle of uniformity of taxation nor by the law of eminent domain, but rather by the settled rules of law applicable to cases involving the exercise of police powers." *Petterson v. City of Naperville*, 9 Ill. 2d 233, 249-50 (1956). A valid exercise of police power requires the enactment to bear a reasonable relationship to the interest sought to be protected, and the means adopted must constitute a reasonable method to accomplish such an objective. *Village of Chatham v. County of Sangamon*, 351 Ill. App. 3d 889, 901 (2004). Like statutes, municipal ordinances are presumed to be valid. *Chavda v. Wolak*, 188 Ill. 2d 394, 398 (1999). The burden of rebutting that presumption is on the party challenging the law's validity. *La Salle National Bank v. City of Evanston*, 57 Ill. 2d 415, 428 (1974).

■ "American local government law and civic culture has increasingly privatized development costs that had previously been carried as general societal expenses. *** Increasingly, local governments combine their traditional land use regulatory powers with their authority to impose land development conditions." R. Rosenberg, *The Changing Culture of American Land Use Regulation: Paying for Growth With Impact Fees*, 59 SMU L. Rev. 177, 181 (2006). Impact fees, or development exactions, are utilized by rapidly growing municipalities in an attempt to "bridge the gap between the increased demand for services brought on by rapid growth and the stagnant or shrinking amount of revenue available from traditional sources." *Thompson v. Village of Newark*, 329 Ill. App. 3d 536, 539 (2002). However, non-home-rule municipalities possess only those powers that are specifically conveyed to them by the Illinois Constitution or by statute. *Commonwealth Edison Co. v. City of Warrenville*, 288 Ill. App. 3d 373, 380 (1997). Impact fees may not be imposed without legislative authority. *Thompson*, 329 Ill. App. 3d at 539. Absent such authority, a municipal enactment is void. *Thompson*, 329 Ill. App. 3d at 539.

■ Section 11—12—5 of the Illinois Municipal Code (65 ILCS 5/11—12—5 (West 2000)) describes the general powers of municipal plan commissions and planning departments, including the preparation of a comprehensive plan for development or redevelopment of a municipality. 65 ILCS 5/11—12—5(1) (West 2000). Specifically, the plan *"may include reasonable requirements* with reference to streets, alleys, *public grounds,* and other improvements hereinafter specified." (Emphases added.) 65 ILCS 5/11—12—5(1) (West 2000). Furthermore:

*"[The] plan may be implemented by ordinances* (a) establishing reasonable standards of design for subdivisions and for resubdivisions of unimproved land and of areas subject to redevelopment in respect to public improvements as herein defined; (b) *establishing reasonable requirements governing* the location, width, course, and surfacing of public streets and highways, alleys, ways for public service facilities, curbs, gutters, sidewalks, street lights, *parks*, playgrounds, *school grounds*, size of lots to be used for residential purposes, storm water drainage, *water supply and distribution*, sanitary sewers, and sewage collection and treatment \*\*\*." (Emphases added.) 65 ILCS 5/11—12—5(1) (West 2000).

The statutory provisions with respect to reasonable requirements for streets and public grounds are based upon the theory that "the developer of a subdivision may be required to assume those costs which are specifically and uniquely attributable to [the developer's] activity and which would otherwise be cast upon the public" (*Rosen* test) (*Rosen v. Village of Downers Grove*, 19 Ill. 2d 448, 453 (1960)). In *Pioneer Trust & Savings Bank v. Village of Mount Prospect*, 22 Ill. 2d 375 (1961), the supreme court explained the *Rosen* test as follows:

"If the requirement is within the statutory grant of power to the municipality and if the burden cast upon the subdivider is specifically and uniquely attributable to [the subdivider's] activity, then the requirement is permissible; if not, it is forbidden and amounts to a confiscation of private property in contravention of the constitutional prohibitions rather than reasonable regulation under the police power." *Pioneer Trust*, 22 Ill. 2d at 380.

### (a) School Impact Fees

■ As to the school impact fees, the trial court found that the Illinois Municipal Code prohibits cash donations for general school operations, as opposed to school grounds. The court also found that the Village's school impact fees were not specifically and uniquely attributable to a development, because they applied to every house and were not adjusted based on a developer's activity.

The Village asserts that its ordinances do not refer to general operations but, rather, specify that the impact fees are used to reimburse the school districts for expenditures made on behalf of new pupils from new Village residences. According to the Village, new pupils from new residences present new demands on schools and satisfy the *Rosen* test. The Village further argues that its ordinances do not expressly require impact fees to be used for general operations and that there was no evidence that the fees were used for any improper purpose. The Village reasons that, given the presumption of the validity of municipal ordinances and Raintree's failure to meet its

burden of showing improper expenditures, the school impact fee provisions should have been upheld.

Raintree responds that the Village's school impact fees are not limited to land acquisition (*i.e.*, school grounds) for schools, but are for the schools' general operation funds to reimburse the schools for expenditures made on behalf of new pupils. Raintree asserts that the schools did not receive all of the impact fees, because portions of the fees, as determined by formula, were retained by the Village. In Raintree's view, since the school impact fees can be utilized for purposes other than land acquisition for schools, the trial court did not err in finding that they are unauthorized. Finally, Raintree argues that the impact fees did not satisfy the *Rosen* test, because they applied to every house under construction and, thus, did not assess each structure's unique impact on the schools.

We agree that the school impact fees were improper. The Village's code provides that school impact fees, "(as adjusted by the formula on file with the Village Administrator)," are "forwarded by the Village to the appropriate" elementary or high school district *"for its general operation fund* at the time of issuance of a certificate of occupancy. This payment is designed *to partially reimburse the school districts* for expenditures made on behalf of new pupils from new residences within the Village." (Emphases added.) Long Grove Municipal Code §4—1—4(B) (amended June 25, 1996). Section 11—12—5(1)(b) of the Illinois Municipal Code provides that a municipality may implement its development plan via ordinances "establishing reasonable requirements governing *** *parks* *** [and] *school grounds.*" (Emphases added.) 65 ILCS 5/11—12—5(1)(b) (West 2000).

In *Thompson v. Village of Newark*, 329 Ill. App. 3d 536 (2002), the Village of Newark, a non-home-rule municipality, passed an ordinance imposing school construction impact fees on new development within the village. The plaintiffs, landowners, sought, *inter alia*, a declaratory judgment that the impact fee ordinance was not authorized by section 11—12—5 of the Illinois Municipal Code. The trial court granted the village summary judgment. On appeal, this court reversed the trial court, holding that the village lacked the statutory authorization to impose impact fees for school construction and, to the extent that it did so, its ordinance was invalid. *Thompson*, 329 Ill. App. 3d at 542. Rejecting the village's argument that the statutory term "school grounds" is broad enough to encompass capital improvements, this court concluded that the plain meaning of the term "school grounds" is land surrounding a school building and does not include the building itself. *Thompson*, 329 Ill. App. 3d at 540. We further held that the remainder of the statute is primarily concerned with traditional plan-

ning concepts such as the location of streets and other improvements and that to read the statute "to also authorize the village to collect revenue to undertake massive capital improvements reads the statutory authority too broadly." *Thompson*, 329 Ill. App. 3d at 540-41.[2]

We hold that the Village exceeded its authority when it enacted ordinances assessing school impact fees. Contrary to the Village's assertion, its ordinances do provide that school impact fees are forwarded to the appropriate elementary or high school district "for its general operation fund." Long Grove Municipal Code §4—1—4(B) (amended June 25, 1996). The restriction in section 11—12—5 of the Illinois Municipal Code specifies that ordinances implementing redevelopment plans may establish reasonable requirements governing only "school grounds." The plain meaning of the term "school grounds," even under its more expansive definition effective as of 2003, is not, in our view, so broad as to encompass a "general operation fund." There is no language in the ordinances to limit expenditures of school districts' general operation funds to expenditures for school buildings and the land surrounding school buildings. Thus, we cannot conclude that the impact fees that partially reimburse school districts for expenditures on new pupils from new residences are limited to expenditures for school buildings and land.

We also reject the Village's argument that the ordinances' limitation that the fees are "designed to partially reimburse the school districts for expenditures made on behalf of new pupils from new residences within the Village" satisfies the *Rosen* test and, therefore, transforms the ordinances into valid enactments. As the supreme court has explained, to satisfy the *Rosen* test, the requirements must be: (1) within the statutory grant of power to the municipality; and (2) specifically and uniquely attributable to the developer's activity. *Pioneer Trust*, 22 Ill. 2d at 380. Here, the Village's ordinances fail the first part of the supreme court's test.

### (b) Open Space Impact Fees

■ Turning to the Village's open space impact fees, the Village's code requires payment of impact fees to the Village's general fund that are "designed to enable the Village, with these moneys, to acquire, maintain, and preserve open space in the Village." Long Grove Municipal Code §4—1—4(B)(3) (1993). A portion of the impact fees is

---

[2]Public Act 93—30, effective as of July 24, 2003, amended section 11—12—5 to provide that "school grounds" includes "land or site improvements, which include school buildings or other infrastructure necessitated and specifically and uniquely attributed to the development or subdivision in question." 65 ILCS 5/11—12—5(7) (West 2004).

allocated to the Long Grove Park District "to assist in the acquisition, maintenance, and preservation of open space within the Village, and for the general operational expenses relating thereto." Long Grove Municipal Code §4—1—4(B)(3) (1993). Again, section 11—12—5(1)(b) of the Illinois Municipal Code provides that a municipality may implement its development plan via ordinances "establishing reasonable requirements governing *** *parks* *** [and] *school grounds*." (Emphases added.) 65 ILCS 5/11—12—5(1)(b) (West 2000).

The trial court found that the Village's open space fees were solely revenue oriented and that there was no evidence that the Village considered anything individual to the construction at issue in order to satisfy the requirement that the fees be specifically and uniquely attributable to Raintree's activity. Further, the court found impermissible the ordinances' provisions concerning the maintenance and preservation of open space. It interpreted the statute as prohibiting cash fees for the maintenance and preservation of existing open space, reasoning that existing open space is not specifically and uniquely attributable to current development activity.

The Village contends that the Illinois Municipal Code uses terms that are synonymous with "open space," where it authorizes municipalities to adopt and implement ordinances to provide for "public grounds," "parks," and "playgrounds," all of which are recreational land uses (see 65 ILCS 5/11—12—5(1)(b) (West 2000)), and asserts that the ordinances' purpose is proper. Furthermore, the Village asserts that the term "open space" is a term of art used to define active and passive recreational lands serving its residents. Open space, according to the Village, encompasses parks, ball fields, public grounds, and unimproved land.

Next, addressing the *Rosen* test, the Village argues that it is a given that new residents from newly constructed homes will have an impact on the Village's finite open space and, therefore, open space fees are a reasonable measure of the specific and unique impact of new residents on the limited open space within the Village. Moreover, the Village argues that the trial court erred by inserting the word "existing" into the ordinances when it found that the open space fees were unauthorized because the Illinois Municipal Code does not permit cash fees for the maintenance and preservation of existing open space. Finally, the Village asserts that there was no evidence that its fees were excessive.

Raintree argues that the Village's open space impact fees are void because the term "open space" is not contained in section 11—12—5 of the Illinois Municipal Code. Alternatively, Raintree contends that, even if the Village had the statutory authority to adopt reasonable

design standards for open space, its ordinances are void because the impact fees are not limited to land acquisition for open space. Furthermore, Raintree argues that there was no evidence that the funds were used solely for open space purposes, because impact fees were deposited into the Village's general operation fund. Finally, Raintree adopts the trial court's findings that the ordinances are not specifically and uniquely attributable to developer activity.

Assuming, without deciding, that the term "open space" in the Village's code comes within the terms "public grounds," "parks," and "playgrounds" in section 11—12—5 of the Illinois Municipal Code (625 ILCS 5/11—12—5(1)(b) (West 2000)), we conclude that section 11—12—5 does not authorize a municipality to require payment of impact fees to the municipality's general fund that are designed to enable it "to acquire, maintain, and preserve open space" therein, where the ordinance does not prohibit use of the funds to maintain and preserve existing open space. The phrasing "to acquire, maintain, and preserve open space" can encompass, as the trial court found, not only newly acquired but also existing open space. The ordinances, therefore, fail to satisfy the *Rosen* test's requirement that a developer may assume only those costs that are "specifically and uniquely attributable to [the developer's] activity." *Rosen*, 19 Ill. 2d at 453. We agree with the trial court that the Village exceeded its statutory authority because the Village's ordinances do not limit the use of impact fees to only newly acquired open space. Accordingly, the ordinances are void.

In summary, we hold that the Village, as a non-home-rule municipality, did not have the statutory authority to impose these impact fees for schools and open space, and, to the extent that they do so, its ordinances (and corresponding code provisions) imposing such fees are invalid.

### 2. Village's Affirmative Defenses

### (a) Voluntary-Payment Doctrine

We turn next to the Village's affirmative defenses. The Village argues that, even if the impact fees were illegal and it exceeded its statutory authority in enacting and enforcing them, the trial court erred in finding that Raintree's impact fee payments were not voluntary, but were made under duress. The Village contends that the trial court misapplied the voluntary-payment doctrine and failed to properly consider certain evidence.

Under the voluntary-payment doctrine, a taxpayer may not recover taxes voluntarily paid, even if the taxing body assessed or imposed the taxes illegally. *Getto v. City of Chicago*, 86 Ill. 2d 39, 48-49 (1981); see also *United Private Detective & Security Ass'n v. City of Chicago*, 56

Ill. App. 3d 242, 244 (1977) (money voluntarily paid cannot generally be recovered even though ordinance requiring the payment is later found to be unconstitutional). A taxpayer can recover taxes voluntarily paid only if such recovery is authorized by statute. *Getto*, 86 Ill. 2d at 48. A taxpayer, however, has paid taxes involuntarily where: (1) the taxpayer lacked knowledge of the facts upon which to protest the taxes at the time he or she paid the taxes; or (2) the taxpayer paid the taxes under duress. *Geary v. Dominick's Finer Foods, Inc.*, 129 Ill. 2d 389, 393 (1989). Whether a party had to protest the taxes is irrelevant to the issue of duress. *Geary*, 129 Ill. 2d at 395. "To negate the applicability of the voluntary payment doctrine, one must not only show that the claim asserted was unlawful but also that payment was not voluntary, that there was some necessity which amounted to compulsion." *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 848 (1995).

The trial court rejected the Village's voluntary-payment defense and found that Raintree sustained its burden to show that the payments were not voluntary, but were made under duress. Specifically, the trial court found that the evidence showed as follows. Raintree did a substantial portion of its business in the Village between 1993 and 1997. Constructing a home without a building permit would have subjected Raintree to fines, other penalties, and delay. Some of Raintree's contracts required it to deliver completed homes to the purchasers within a specified time, and it made verbal commitments to other purchasers to deliver completed homes within six to eight months. To deliver the homes within those times, Raintree needed to obtain building permits from the Village, and it would have breached its contracts if it had failed to obtain them. Further, Raintree financed its operations by either taking out mortgages or drawing on lines of credit, such that any construction delay would have resulted in substantial financial hardship. Thus, conducting business without proper permits was not feasible, because it would have resulted in the loss of some or all of the contracts, severe financial hardship, and damage to Raintree's business reputation.

Accordingly, the trial court found that the motive for payment of the impact fees was a business compulsion and, therefore, the payment was made under duress. Noting the Village's assertion that Raintree could have conducted business in other towns, the court found that this would have financially damaged Raintree because its customers desired to build in the Village. The court concluded that Raintree's only commercially reasonable course of action was to pay the Village the impact fees in order to obtain the building permits and to avoid: (1) potential liability for breach of contract; (2) potential loss

of the contracts; (3) fines or other penalties; (4) additional principal and interest payments; (5) damage to its business reputation; and (6) substantial loss of business.

To show duress, the payor must show "that the payment was not voluntary because there was some necessity that amounted to compulsion and that the payment was made under the influence of that compulsion." *Ramirez v. Smart Corp.*, 371 Ill. App. 3d 797, 802 (2007). To render a payment compulsory, "[t]here must be some actual or threatened power wielded over the payor from which [the payor] has no immediate relief and from which no adequate opportunity is afforded the payor to effectively resist the demand for payment." *Smith*, 276 Ill. App. 3d at 849.

■ *Geary* is the supreme court's most recent pronouncement on duress and the role of protest. The *Geary* court reviewed its holdings in *Getto* and other cases to clarify the law. In *Getto*, the supreme court had used the conjunctive "and" in reciting the following test:

> "Though payment under protest is the typical means by which a taxpayer signifies his contention that a tax or charge was improper, the absence of such a protest does not, without more, require application of the voluntary-payment doctrine. It must also be shown that the taxpayer plaintiff had knowledge of the facts upon which to frame a *protest and* also that the payments were not made under *duress or compulsion.*" (Emphases added.) *Getto*, 86 Ill. 2d at 48-49.

However, in *Geary*, the supreme court recited the test in the disjunctive, even though it relied on *Getto*: "A taxpayer, however, has paid the taxes *involuntarily* if (1) the taxpayer lacked knowledge of the facts upon which to protest the taxes at the time he or she paid the taxes, *or* (2) the taxpayer paid the taxes under duress." (Emphases in original.) *Geary*, 129 Ill. 2d at 393, citing *Getto*, 86 Ill. 2d at 48-49. The *Geary* court noted that the parties in that case had discussed whether the plaintiffs had to protest the taxes, whether the plaintiffs had sufficient knowledge to protest the taxes, and what form of protest the plaintiffs had to make. The court declined to address those issues, because they were not certified by the trial court. *Geary*, 129 Ill. 2d at 394. However, it noted:

> "*[W]hether plaintiffs had to protest the taxes is irrelevant to the issue of duress because the absence of a protest is not enough to establish that a taxpayer made a payment voluntarily. (Getto, 86 Ill. 2d at 49.)* Defendants argue that plaintiffs could have filed a protest, either informally or pursuant to [statute], but failed to do so. Regardless, according to *Getto*, plaintiffs could still proceed with their claim, if they could succeed in establishing duress *alone*. *Getto*, 86 Ill. 2d at 49." (Emphases added.) *Geary*, 129 Ill. 2d at 395.

In the context of addressing the defendant's argument that it would be unfair to permit application of an exception to the voluntary-payment doctrine in a case where taxpayers paid a tax for many years without protest, the *Geary* court stated:

> "First, taxpayers cannot recover disputed taxes if their suit is barred by the statute of limitations [citation]; thus, taxpayers have an incentive to initiate their suits promptly. Second, the voluntary-payment doctrine is a long-standing rule in this State and *plaintiffs have always been allowed to use duress as an exception to the doctrine, regardless of whether they failed to protest a tax or whether they had knowledge of a tax.* Any other construction of the doctrine and its exceptions would be inconsistent with the explicit holdings of [*Illinois Glass Co. v. Chicago Telephone Co.*, 234 Ill. 535 (1908),] and *Getto.*" (Emphasis added.) *Geary*, 129 Ill. 2d at 407.

We are bound by this precedent. In its assessment of the evidence, the dissent concedes that protest is not controlling, but it nevertheless focuses on Raintree's failure to protest the impact fees. In this regard, the dissent misreads the law on duress. Indeed, its analysis is contrary to *Geary*'s instruction that protest is irrelevant. See *Geary*, 129 Ill. 2d at 395.

Duress and compulsory payment are generally questions of fact to be judged in light of all of the circumstances surrounding the transaction. *Ramirez*, 371 Ill. App. 3d at 802. We review the trial court's findings under the manifest-weight-of-the-evidence standard. *Wermers Floorcovering, Inc. v. Santanna Natural Gas Corp.*, 342 Ill. App. 3d 222, 224 (2003). A court's findings are against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite conclusion. *Wermers*, 342 Ill. App. 3d at 224.

On appeal, the Village argues that Raintree failed to show duress. The Village argues that Raintree paid the impact fees over many years without protest, that it did not conduct a substantial portion of its business in the Village, that Raintree's business (*i.e.*, the fact that it is a builder and not a developer or subdivider that holds an inventory of lots in a particular subdivision) is not conducive to duress, that there were no deadlines in Raintree's contracts, and that Raintree was not driven by necessity.

Specifically, the Village points to the fact that Raintree paid the fees for almost 10 years. The Village notes that Raintree applied for its first building permit and paid its first impact fees in 1988; however, the first fees for which it sought reimbursement by way of this litigation were paid relative to a building permit issued in August 1993. The Village asserts that Raintree was not only aware that impact fees

were included in the building permit fees, but it also accepted this arrangement as evidenced by its continual application for, and payment of, the permit fees. According to the Village, Raintree was under no compulsion to keep returning to the Village, but it chose to do so. Thus, the Village reasons, it was unreasonable for the trial court to find that Raintree was under duress during this time. The Village also contends that Raintree did not do a substantial portion of its business in the Village. It contends that there was no business compulsion to overcome Raintree's voluntary decision to continue to do business in the Village. According to the Village, between 1988 and 1997, Raintree built 43 homes in the Village, or about 4 homes per year. This equals about one-third of Raintree's business. The Village argues that this evidence shows that Raintree did the majority of its business outside of the Village and that it could have avoided the Village's impact fees, but for its determination that it was good business to build in the Village. The Village further asserts that there was no evidence that doing business in the Village was less profitable than doing business elsewhere and contends that Raintree's true competitors as to the Village's market were other builders building in the Village, all of whom were paying the same impact fees. As to other markets, the Village argues that there was no evidence as to the costs of doing business elsewhere, and other towns may have had higher fees. Without knowing the fees charged by other municipalities, no conclusion can be reached that Raintree suffered by doing business in the Village. Also, the Village argues that the fact that Raintree continued to do business in the Village despite the fees suggests that it was profitable to do so. Duress, in the Village's view, cannot be self-inflicted, especially when profit is involved.

Next, the Village argues that the trial court made two errors relative to the evidence of Raintree's mode of operation. First, the Village contends that the trial court erred in finding that some contracts required Raintree to deliver completed homes within a certain time, thus giving the impression that Raintree had to pay the impact fees or risk breaching its contracts by failing to timely complete construction. The Village argues that the documents did not specify any deadline. Second, the Village contends that the trial court's finding that Raintree financed its business operations by taking out mortgages or drawing on lines of credit was erroneous because Raintree did not purchase lots and take out mortgages thereon. Rather, it entered into contracts with customers and then closed on the purchase of the lots. Thus, Raintree did not carry a debt load that would have made it susceptible to duress. In the Village's view, Raintree managed its risk by purchasing lots on a transaction-by-transaction basis, locking in its customers, and then having the customers pay deposits.

Raintree responds that, as a home builder, it was required to have building permits to operate its business. It contends that the trial court correctly found that Raintree's only commercially reasonable course was to pay the Village the impact fees to avoid potential liability for breach of contract, potential loss of contracts, fines or other penalties, additional principal and interest payments, damage to its business reputation, and substantial loss of income. Raintree asserts that its controlling motive for paying the fees was the desire to avoid adverse economic consequences from being unable to build in the Village. Raintree further argues that Brown testified that, if Raintree owned a lot, it paid principal and interest until it closed on the lot. Further, Raintree owned 13 of the 19 lots at issue, purchased some of them in a package, and held them as inventory until it found customers. Raintree also notes Brown's testimony that customers sometimes owned lots on which Raintree built homes. In these cases, Raintree financed the construction costs through lines of credit, and, the longer it took to close on the home, the less profit it earned. Raintree further asserts that payments over several years were still made under duress because it had no reasonable means of immediate relief, except paying the subject fees. It points to Brown's testimony that he considered filing a lawsuit but speculated that it would take several years to litigate and that Raintree would not have been able to build in the Village during that time. Raintree asserts that the Village did not present any evidence as to how Raintree could have obtained immediate relief from the requirement to pay impact fees in order to obtain building permits. It also points to the trial court's finding that Raintree's customers desired to build in the Village and notes Brown's testimony that the market at that time was in the Village.

The concept of duress includes compulsion of businesses. See *United Private Detective*, 56 Ill. App. 3d at 244. Case law addressing business compulsion provides some instruction. In *Rosen*, the plaintiff corporation owned a tract of land that it proposed to subdivide into 52 lots. The village's plan commission approved the plaintiff's plat after the plaintiff executed an agreement that required it to deposit $325 in escrow for each lot sold. Under the agreement, the money would subsequently be forwarded to the school districts if the ordinance was not found to be invalid. By the time the trial commenced, the plaintiff had paid over $7,000. After noting the plaintiff's protest,[3] but not

---

[3]The plaintiff initially paid with a check that was refused and that stated that payment was made under protest. Subsequent checks did not state that payment was made under protest, but the plaintiff sent a letter to the boards of education, stating its understanding that its refund claim would not be prejudiced by the payments. *Rosen*, 19 Ill. 2d at 455.

discussing its import, the supreme court held that there was economic pressure on the plaintiff and that it established duress:

"[The plaintiff] is engaged in the business of subdividing raw land upon a large scale, and *** it is under contractual obligations to furnish building sites to contractors who are engaged in the construction of buildings. The economic pressure upon such a large scale developer is obvious and we think duress has been established in this case." *Rosen*, 19 Ill. 2d at 455-56.

In *Edward P. Allison Co. v. Village of Dolton*, 24 Ill. 2d 233 (1962), an electrical contractor brought an action to recover money allegedly paid under duress to a village as license and inspection fees. The supreme court held that the payments to the village were not voluntary, where the contractor had a business contract for electrical work, was threatened by a village official that the work would be stopped unless the fees were paid, and was faced with severe penalties or loss of the contract. *Allison*, 24 Ill. 2d at 236. The court also noted that the contractor did not admit the validity of the fees or the ordinance and had reserved the right to protest them. *Allison*, 24 Ill. 2d at 236-37.

In *People ex rel. Carpentier v. Treloar Trucking Co.*, 13 Ill. 2d 596 (1958), the State sought to exact license fees from the defendant trucking company for truck license plates. The defendant was in the business of transporting automobiles by truck and filed an application for license plates for an improper classification because the Secretary of State prevented him from seeking the appropriate classification. The supreme court held that the defendant's application and payment thereunder were made under duress and compulsion and thus were not voluntary. *Treloar*, 13 Ill. 2d at 600. The court explained that economic necessity required the defendant to file the application if he was to carry on his business. *Treloar*, 13 Ill. 2d at 600. Also, he was required to file his application to avoid statutory penalties. *Treloar*, 13 Ill. 2d at 600. Further, the supreme court noted that, although the defendant's failure to protest was not properly before it, "we believe it not to have been necessary to defendant's position and action in this cause." *Treloar*, 13 Ill. 2d at 601.

Similarly, in *People ex rel. Carpentier v. Arthur Morgan Trucking Co.*, 16 Ill. 2d 313 (1959), the State sought mileage taxes for trucks operated in Illinois by the defendant Missouri-based trucking company. The company had 125 trucks in its fleet. In 1951 and 1952, 17 of its trucks hauled sand, rock, and equipment from plants and quarries in or near East St. Louis, Illinois, to construction sites in the St. Louis area of Missouri. Also, some supplies were hauled from St. Louis to

points in and around East St. Louis. On "several" occasions in 1951, drivers of trucks displaying Missouri plates were arrested in Illinois for failure to have Illinois plates, even though the trucks were operating in interstate commerce within 25 miles of Missouri and, thus, were not subject to Illinois license requirements under the states' reciprocity statutes. The arrests resulted in fines paid by the trucking company, as well as a disruption of business. The trucking company applied for Illinois licenses to prevent further arrests and disruption of business. The supreme court held that the trucking company made the Illinois applications under duress and that its failure to protest the license fees was not fatal. *Arthur Morgan Trucking Co.*, 16 Ill. 2d at 320.

Finally, in *United Private Detective*, the plaintiffs, private detectives and agencies, sought to recover license fees, alleging that they were illegally collected under an invalid city ordinance. The appellate court held that the trial court did not err in finding that the plaintiffs' complaint sufficiently stated facts warranting a finding that the payments for the licenses were made under duress, where the "plaintiffs alleged that the controlling motive for the payment of fees was the desire to avoid adverse economic consequences imposed by an ordinance they believed to be invalid." *United Private Detective*, 56 Ill. App. 3d at 245. The court noted that, although the plaintiffs did not file a formal protest, two days after the fees were paid they filed suit in federal court to have the ordinance declared unconstitutional. *United Private Detective*, 56 Ill. App. 3d at 245.

The dissent argues that recoupment of payments made under duress has been either limited to items and services that constitute necessities or allowed only when there has been a protest. See, *e.g.*, *Wermers*, 342 Ill. App. 3d at 225 (necessities). We disagree with this reading of the case law. Necessity and protest are not the only bases upon which recoupment has been allowed on the basis of duress. See, *e.g.*, *DeBruyn v. Elrod*, 84 Ill. 2d 128, 136 (1981) (plaintiff challenged constitutionality of fees collected by sheriff; duress shown where plaintiffs were confronted with choice of payment of sheriff's fees or his refusal to effect the requested sale, execution, or redemption); *Arthur Morgan Trucking Co.*, 16 Ill. 2d at 320 (truck license plates; duress found, but plates not declared necessities); *Treloar*, 13 Ill. 2d at 600 (same); *Norton v. City of Chicago*, 293 Ill. App. 3d 620, 628 (1997) (plaintiffs challenged delinquent penalty fee on parking fines; reversing summary judgment for county, court held that demand notices from city were coercive enough to render plaintiffs' payment involuntary); *Ball v. Village of Streamwood*, 281 Ill. App. 3d 679, 688 (1996) (constitutional challenge to village tax ordinance imposing real

estate transfer tax on vendors but exempting vendors who then purchased residences within village; duress existed where taxpayers filed no protest, but where their residences were subject to contracts to sell to third parties and village code provided for civil penalties for failure to pay the tax); *Terra-Nova Investments v. Rosewell*, 235 Ill. App. 3d 330, 337 (1992) (constitutional challenge to revenue act provision that provided that fees in excess of $500,000 collected from tax buyers at scavenger tax sale for sale in error fund shall be transferred to general revenue fund; plaintiff did not pay under protest, but duress was shown where plaintiff had little choice but to pay the fee).

■ We conclude that the trial court did not err in finding that Raintree paid the impact fees under duress. We find unavailing the Village's point that Raintree paid the impact fees for five years— beginning in 1988—before it sued, seeking recovery of the fees from 1993 through 1998. In *Getto*, telephone company subscribers sued a municipality and telephone company, challenging the calculation of the city's municipal message tax. The defendants argued that the utility payments made by the plaintiffs from 1955 through July 1977, when they filed suit, were made without protest and, therefore, recovery was barred by the voluntary-payment doctrine. The supreme court held that, even if all payments prior to 1977 were voluntary, the threat that telephone service would be shut off for nonpayment of charges amounted to compulsion that precluded application of the voluntary-payment doctrine. *Getto*, 86 Ill. 2d at 51. Furthermore, in another case, the supreme court rejected the argument that it would be unfair if taxpayers waited many years, without protest, before initiating suit and arguing that they paid under duress. *Geary*, 129 Ill. 2d at 407. In *Geary*, the court noted that the statute of limitations operates to bar recovery if a suit is not promptly filed and that the duress exception to the voluntary-payment doctrine has long been available in Illinois, regardless of whether the taxpayers protested or whether they had knowledge of the tax. *Geary*, 129 Ill. 2d at 407.

We also reject the Village's argument that Raintree did not conduct a substantial portion of its business in the Village and that there was no business compulsion or necessity to continue to do business in the Village. Brown testified that Raintree paid the impact fees to obtain the building permits and that, if he had been unable to obtain the building permits, Raintree would have gone out of business. He also stated that Raintree would have breached its contracts with its customers. Explaining his decision to build in the Village, Brown testified that Raintree had "substantial commitments in land" in the Village and that the market was in the Village at that time; he stated that some Village lots were purchased in a package. Although Eckert

testified that Raintree Homes did not keep a sizable inventory of lots—it kept between 6 and 25 lots at any given time—it was the trial court's function to resolve this conflict in the evidence. We cannot conclude that its findings were unreasonable.

As to the Village's argument that Raintree's continuous building in the Village suggests that it was profitable for Raintree to build in the Village, we disagree that profitability defeats a duress argument. The evidence showed that Raintree could not have obtained any building permits without paying the associated impact fees. Without building permits, it could not have legally built homes in the Village. The facts that it built homes (after obtaining building permits) in the Village and that it apparently profited miss the point of Raintree's assertion that it paid the fees under duress. To show duress, as noted, a payor must show "that the payment was not voluntary because there was some necessity that amounted to compulsion and that the payment was made under the influence of that compulsion." *Ramirez*, 371 Ill. App. 3d at 802. A payment is compulsory when there is some power wielded over the payor from which the payor has no immediate relief and from which there is no adequate opportunity for the payor to effectively resist the demand for payment. *Smith*, 276 Ill. App. 3d at 849. The trial court did not err in finding that duress was clearly shown here. Case law supports this conclusion. The *Rosen* court did not look to the developer's overall profitability in upholding the trial court's duress finding. Rather, it looked to the development at issue and the developer's contractual commitments with respect to that development and, given the size of the enterprise, held that duress had been established. *Rosen*, 19 Ill. 2d at 455-56. In *Allison*, the electrical contractor had only one business contract for which it was required to pay license and inspection fees; the village had threatened a work stoppage, and the contractor faced penalties or loss of the contract. *Allison*, 24 Ill. 2d at 236. In finding that the payments were involuntary, the court did not discuss the contractor's overall business profitability or its choice to do business in that particular municipality.

We turn next to the Village's arguments relating to the evidence of Raintree's mode of operation. First, the Village contends that the trial court erred in finding that Raintree's documents specified a construction deadline. It asserts that the documents did not contain any deadline. Second, the Village argues that the trial court erred in finding that Raintree financed its operations by taking out mortgages or drawing on lines of credit. According to the Village, Raintree did not carry a debt load such that it was susceptible to duress.

As to construction deadlines, the trial court found that "some" of the contracts required Raintree to deliver completed homes within a

specified time and that it made verbal commitments to its other customers. Brown testified that some of its contracts between 1993 and 1997 specified a construction deadline and that, in certain other transactions, Raintree verbally communicated to its customers a completion date. Eckert also testified that Raintree sometimes owned the lots on which it built homes for its customers. Contrary to the Village's assertion, some of the construction contracts did contain a deadline. For example, a rider attached to the contract on Lot 11 in Stonehaven, which was dated October 7, 1996, provided that the closing would be on August 1, 1997. The agreement for Lot 3 in Bridgewater Farm, dated February 2, 1994, specified that Raintree would use its best efforts to complete the home no later than June 31, 1994.

As to Raintree's mode of financing, the trial court found that Raintree financed its projects "either by taking out mortgages or drawing on lines of credit. Thus, any delay in the construction of the homes at issue in this case would result in a substantial financial hardship for [Raintree]." The Village argues that the evidence showed that Raintree did not purchase lots and take out mortgages thereon; rather, it entered into contracts with customers and then closed on the lot purchases. Thus, it did not carry a debt load that would have made it susceptible to duress. We find that the trial court did not err. Both Brown and Eckert testified that Raintree sometimes sold to its customers both the land that it owned and the home that it thereafter built on the lot. Brown stated that, in these cases, Raintree financed the purchase through a mortgage or a line of credit. Indeed, of the 19 lots for which Raintree sought a refund of the impact fees, Raintree owned 13 lots and its customers owned 6 lots. Accordingly, we find no error with the trial court's findings, and, to the extent they imply that Raintree owned all of the lots on which it built homes, we do not find the error of import, because Raintree owned 13 of the 19 lots at issue in this case.

In summary, we conclude that the trial court did not err in finding that Raintree paid the impact fees under duress.

### (b) Pass-on Defense

■ Next, the Village argues that the trial court erred in finding that Raintree did not pass on the cost of the impact fees to its customers. In Illinois, there is a policy against unjust enrichment through the refund of illegal taxes. *Consolidated Distilled Products, Inc. v. Mahin*, 56 Ill. 2d 110, 116 (1973); *Benzoline Motor Fuel Co. v. Bollinger*, 353 Ill. 600, 610-11 (1933). The pass-on defense forecloses a taxpayer's entitlement to a tax refund, unless the taxpayer shows that it bore the burden of the tax and did not pass it on to another party. See

*Milwaukee Safeguard Insurance Co. v. Selcke*, 324 Ill. App. 3d 344, 351 (2001). The pass-on defense may be raised as an affirmative defense or during the remedial phase of litigation. *Milwaukee Safeguard Insurance*, 324 Ill. App. 3d at 353. A party challenging a taxpayer's entitlement to a refund bears the burden of raising the pass-on defense. *Milwaukee Safeguard Insurance*, 324 Ill. App. 3d at 353. Once the defense is raised, it becomes the taxpayer's burden to show that it did not pass on the tax to another party. *Milwaukee Safeguard Insurance*, 324 Ill. App. 3d at 353. Although an impact fee is not a tax, the similarities between both types of payments are sufficient to render instructive certain tax cases. *Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 266 (2001). The single factor that determines entitlement to a refund is whether the person or entity seeking it " 'bore the burden of the tax and not whether [the person or entity] bore it as a "separate identified charge" or as a so-called "hidden charge." ' " *Consolidated Distilled Products, Inc.*, 56 Ill. 2d at 116, quoting *Fiorito v. Jones*, 45 Ill. 2d 15, 17 (1970).

The question whether Raintree passed on the impact fees to its customers is a question of fact. A reviewing court will not disturb the trial court's factual findings unless they are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002).

The trial court rejected the Village's pass-on defense, finding that both Brown and Eckert testified that the base price for each Raintree model home was the same, regardless of municipality. The court found unavailing the Village's argument that there was testimony that all prices generally took into account fees and costs and, therefore, impact fees must have been passed on to consumers; it noted that no business could ever withstand the pass-on defense if that were the law. Furthermore, the court found that evidence that the impact fees were itemized in sworn contractor's statements and in budgeting documents prepared for Raintree's cash-flow planning did not contradict Brown's and Eckert's testimony. Finally, the court rejected the Village's argument that the court must presume that documents Raintree contended were unavailable due to computer malfunction would have been unfavorable to Raintree. The court accepted the witnesses' explanation of the computer problems and noted that it did not view as "sinister" Raintree's inability to produce the documents.

The Village argues that the trial court erred in finding that the base price for each model home Raintree built was the same regardless of the municipality in which it was built. It also asserts that the trial court erred in finding that Raintree's profits in the Village were reduced by the amount of the impact fees. According to the Village, whether Raintree's profits were greater or less as a result of the impact

fee payments is not relevant to whether that cost was borne by the home buyers. It also argues that there was no evidence to support that finding. In the Village's view, the price that Raintree charged for a given home had nothing to do with whether that price included the cost of the impact fees, and the trial court failed to grasp the distinction between the home price and the costs included in that price. Otherwise, according to the Village, there is no explanation for the trial court's discounting of Eckert's testimony that the home prices did include the entire cost of the building permits (which included the impact fees). Notwithstanding its assertion that Raintree's profits are irrelevant, the Village also notes that Raintree failed to produce any documents addressing its profitability in the Village, relying instead on an "excuse" relating to computer failure. The Village argues that the trial court erred in finding that Raintree "generally" took fees and costs into account in setting its home prices. According to the Village, Eckert testified that the building permit costs, including the impact fees, were included in the home prices, and, for every home where the records were produced, the documents showed that the impact fees were passed on to the home buyers.

The Village further argues that the trial court erred in finding credible Brown's testimony. Brown testified that Raintree had a base price for each of its homes and that the base price did not include the cost of the impact fees. The Village contends that it was erroneous for the trial court to find this testimony credible, because Brown did not set the prices for the homes for which Raintree sought reimbursement and because Eckert testified that Raintree did pass on the impact fees to its buyers. As to the lots at issue, Eckert, not Brown, was the key principal relative to cost preparation. According to the Village, Eckert's testimony that Raintree's files were not purged (*i.e.*, that paper copies should still have existed) should have been given greater weight than Brown's "unsupported" computer-crashing "excuse." Furthermore, the Village asserts that the documents Raintree produced bear out Eckert's testimony. According to the Village's calculations, because more than half of the building permit costs were passed on to the home buyers and because impact fees were more than half of the total building permit cost, at least a portion of the cost of the impact fees was passed on to Raintree's home buyers. Also, the Village takes issue with the trial court's apparent discount of Perlman's testimony that the industry standard is that impact and building permit fees are included in home prices.

We conclude that the trial court's findings are not against the manifest weight of the evidence. Contrary to the Village's assertion, both Brown and Eckert testified that Raintree did not pass on the

impact fees to its customers. Brown stated that, between 1993 and 1997, both he and Eckert set the base prices of the homes and for extras and that the base prices included the building permit costs, but not the impact fees that Raintree paid. Brown conceded that Eckert met with the customers and set the specific prices for their homes, but he also testified that he was familiar with the contracts. Eckert testified that building permit costs were included in the base price of each model and that this base price was the same, regardless of the municipality in which Raintree built the home. However, contrary to the Village's assertion, he further stated that the base price did not include impact fees. Eckert also testified, in accord with Brown, that, to the extent that impact fees varied between communities, Raintree's "bottom line" was impacted accordingly. Eckert further explained that the costs listed in certain documents produced at trial were not related to the prices charged for the homes and that Raintree's cost to construct a home did not equal the price it charged its customer. Brown testified that Raintree did not pass on the impact fees to its customers, because he desired to have his company remain competitive in terms of its pricing. Brown explained that he did not believe that impact fees were attributable to the building process. He also noted that, where Raintree did charge its customers impact fees (which are not the subject of this suit), such fees were noted as an allowance and were reflected in the closing statement as a miscellaneous calculation. We cannot conclude that it was unreasonable for the trial court to find credible Brown's and Eckert's testimony concerning the impact fees. Although Perlman testified that it was industry practice to pass on the impact fees to customers, he was unable to specify which Raintree documents he relied on to conclude that Raintree had done so. The trial court, by virtue of its ability to observe the conduct and demeanor of witnesses, is in the best position to assess their credibility. *Eychaner*, 202 Ill. 2d at 270-71. It was not unreasonable for the trial court to discount this testimony.

As to the Village's arguments concerning the documents that Raintree produced, we conclude that the trial court's finding that they corroborated Brown's and Eckert's testimony is not against the manifest weight of the evidence. The Village asserts that the documents showed that the impact fees were passed on to Raintree's customers. We disagree that the evidence mandated only this conclusion. Addressing the sworn contractor's statements, Brown testified that they contained estimates of what Raintree paid to subcontractors to perform certain tasks and did not note that the customers were charged impact fees. Similarly, he stated that the job cost estimates were estimates of cash outlays that Raintree predicted it would encounter during construc-

tion and were not related to prices charged to customers. Eckert corroborated this testimony. He testified that sworn contractor's statements were generated for the closing on the home and were required by the title company. Eckert further stated that the sheets that listed costs were not related to the pricing of the homes and that the pricing occurred after the contracts were signed. According to Eckert, the costs that Raintree incurred to construct a home did not equal the price it charged its customer. Further, Raintree would not merely add up its costs and add on a certain profit to arrive at its selling price. Brown explained that the purchase price did not include every cost paid by Raintree to build the home. The purchase price was calculated by adding to the base price the costs of extras chosen by the customer. Again, we reject the Village's argument that this testimony was inherently unbelievable. Contrary to the Village's contention, Raintree's principals did not testify that Raintree determined all of its costs after it entered into contracts with its customers; rather, Brown and Eckert testified that the home prices did not equal Raintree's total construction costs.

We also reject the Village's argument that Raintree's failure to produce certain profit and loss statements due to a computer failure has any bearing on the Village's pass-on defense. The trial court found credible Raintree's explanation that a computer failure prevented Raintree from providing certain documents. This finding was not unreasonable. Brown testified that Raintree did not destroy any documents and, in any event, that none of the lost documents would have provided any information concerning whether impact fees were passed on. He explained that they contained the contract prices, lot prices, total (not itemized) construction costs, realtor's fees, and profit margins. As Raintree notes, the single profit and loss statement that it was able to produce did not contain any information concerning impact fees. Accordingly, we reject the Village's argument that the only reasonable inference from the evidence was that Raintree's explanation that a computer failure occurred was merely an "excuse."

In summary, we hold that the trial court's finding that Raintree did not pass on the impact fees to its customers is not against the manifest weight of the evidence.

### B. Raintree's Cross-Appeal

■ In its cross-appeal, Raintree argues that, assuming this court determines that the ordinances are invalid, the trial court erred in denying its motion for prejudgment interest. In its motion, Raintree sought 5% interest on the fees it had paid to the Village, which interest, it asserted, equaled $64,753.48. Raintree notes that the trial court

found that the Village exceeded its authority in enacting the ordinances and that the impact fees were invalid. Raintree reasons that the Village, therefore, wrongfully exacted money from it and held the funds without just right or claim. For this reason, Raintree argues that it was error for the trial court to deny its motion for prejudgment interest.

The Village responds that the trial court did not abuse its discretion in denying Raintree's request for prejudgment interest. The Village agrees with Raintree that interest cannot be awarded except where a municipality has wrongfully exacted money and holds it without just right or claim. According to the Village, however, the trial court merely found that the Village had exceeded its authority in enacting the ordinances, not that the impact fees were wrongfully exacted and were held without just right or claim.

Generally, interest is not recoverable absent a statute or agreement providing for it. *City of Springfield v. Allphin*, 82 Ill. 2d 571, 576 (1980). The Interest Act (815 ILCS 205/0.01 *et seq.* (West 2006)) does not authorize the imposition of interest against a municipality. *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 128 Ill. App. 3d 678, 681 (1984); see also 815 ILCS 205/2 (West 2006). An exception to this rule applies where a municipality has wrongfully exacted money and holds it without just right or claim. *County of La Salle v. Simmons*, 10 Ill. (5 Gilm.) 513, 518 (1849); see also *Allphin*, 82 Ill. 2d at 577-78. The exception applies where the wrongful party actually has money in its possession that is determined to belong to another. *Kozak*, 128 Ill. App. 3d at 681.

Initially, the parties disagree over the proper standard of review. Raintree asserts, without citation to any authority, that we must review the issue *de novo* and, therefore, apply the same test the trial court applied and determine whether the Village wrongfully exacted money and held it without just right or claim. The Village, without citing any relevant authority, responds that we must review the trial court's decision to determine if the court abused its discretion. As the Village notes, there is no transcript in the record on appeal of the hearing on Raintree's motion for prejudgment interest. Therefore, if the abuse-of-discretion standard applies, we must presume that the trial court acted properly. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984) (without transcript of hearing on motion, "there is no basis for holding that the trial court abused discretion in denying the motion").

We conclude that *de novo* review is appropriate here because the question presented to the trial court was legal. *Woods v. Cole*, 181 Ill. 2d 512, 516 (1998) (where question presented is one of law, review is *de novo*). The trial court's assessment of the ordinances' validity

involved a legal issue—whether the Village exceeded its statutory authority when it enacted the ordinances. The trial court's assessment of whether its finding that the Village exceeded its statutory authority necessarily meant that the Village wrongfully obtained and illegally withheld funds from Raintree (and, therefore, warranted assessment of prejudgment interest) also involved a legal question. In making these assessments, the trial court did not exercise discretion.

Turning to the merits, we must determine whether the Village wrongfully obtained and illegally withheld funds from Raintree when it enacted the void ordinances and collected the impact fees. Our review of the case law reveals that interest should be assessed against a municipality under the foregoing exception only when the municipality engages in fraudulent conduct or deprives others of an essential service such as water. Although the early case law generally refers to tortious conduct in the context of the exception, the actual standard appears to be fraud.

In *County of Pike v. Hosford*, 11 Ill. 170 (1849), a builder contracted with a county to build a bridge. The county agreed to pay the builder after the bridge was completed and accepted. The county partially paid the builder upon completion; subsequently, it tendered the remaining amount. The builder refused the second payment, asserting that it should have included interest. There was no contractual agreement to pay interest. The supreme court held that the county complied with the contract, and it reversed the circuit court's interest award: "counties do not pay interest on their contracts, except in pursuance of an express agreement to do so; but that in actions originating in torts, they are liable to the same extent as private persons." *Hosford*, 11 Ill. at 176. The *Hosford* court contrasted the facts in that case with *La Salle County v. Simmons*, 10 Ill. (5 Gilm.) 513 (1849). *Hosford*, 11 Ill. at 176.

In *Simmons*, county commissioners gave notice that they would grant a license for a ferry service across the Illinois River to the person who donated the largest sum to the county. The plaintiff had kept the ferry up to that time, and he bid $500 for the license. The plaintiff later sued for return of his money plus interest. The supreme court concluded that the commissioners exceeded their statutory authority and did not have discretion as to the sum to be paid for the franchise: "they decided to establish the ferry, but chose only to grant the license to the person that would pay the largest amount of money for the franchise in addition to the [$100] tax which they might legally impose." *Simmons*, 10 Ill. (5 Gilm.) at 517. The court held that the commissioners wrongfully obtained money from the plaintiff that they could not in equity and good conscience retain:

"The money was exacted from the plaintiff under circumstances that strip the transaction of all the features of a voluntary payment. It was in law and fact a compulsory payment, as much so as the payment of usurious interest, which the lender exacts from the borrower; or the payment of illegal charges, which an officer demands as the condition of the performance of official services." *Simmons*, 10 Ill. (5 Gilm.) at 518.

As to interest, the court held that the plaintiff was entitled to interest because the money was wrongfully obtained and illegally withheld from him:

"The plaintiff was deprived of the use of his money without his fault, and he ought to receive compensation by the allowance of interest in the way of damages. Where a defendant fraudulently obtained or wrongfully detained the money of the plaintiff, he is chargeable with interest from the time of his so obtaining or detaining the same. \*\*\* Where money is obtained by *fraud or deceit*, and the party injured waives the tort and brings his action on the implied promise to restore it, interest may be allowed as damages." (Emphasis added.) *Simmons*, 10 Ill. (5 Gilm.) at 520.

In *Vider v. City of Chicago*, 164 Ill. 354 (1896), the City of Chicago had contracted with a construction company to improve a street, and the contract was to be paid out of the proceeds of a special assessment on the property on that street. The contractor improved the street, but the city stayed collection of the assessment for one year; it then collected it and paid it one year late. The contractor sued, seeking damages caused by the delay in payment. The supreme court rejected the claim, holding that, while the delay in collecting and paying the funds was without legal justification, the delay in payment did not warrant an interest award. *Vider*, 164 Ill. at 358-59. The court further stated that the city's action "was a clear violation of duty which the city owed to plaintiff in error, but the action was not *fraudulent*, nor did it render the city guilty of a tort." (Emphasis added.) *Vider*, 164 Ill. at 359. It further noted that the city's action "did not amount to a *tort*, and it cannot be held liable for damages in the form of interest." (Emphasis added.) *Vider*, 164 Ill. at 359.

In *City of Chicago v. Northwestern Mutual Life Insurance Co.*, 218 Ill. 40 (1905), the city exacted back water rates from a property owner. The back rates were not liens on the premises. Asserting that the back rates were accrued by the former owners, the new owner paid under protest to prevent the city from shutting off the water supply. The supreme court noted that the parties:

"did not stand upon the same footing, as [the city] had the power and means to deprive [the property owner] of its water supply, and had threatened to exercise this power, and had in some instances

actually shut off the water. The various pieces of property were occupied as residences and stores, which required water, and to shut the water off from them would entail great damage to [the property owner], as it had no other means of supplying them." *Northwestern*, 218 Ill. at 43.

The court held that the payments were made under duress and that the owner was entitled to recover its money. *Northwestern*, 218 Ill. at 44. As to interest, the court upheld the circuit court's interest award, noting that the city wrongfully took money from the property owner. *Northwestern*, 218 Ill. at 44. Without further analysis, the court recited the general rule that a municipal corporation that wrongfully exacts money and holds it without just right or claim is liable for interest on the same. *Northwestern*, 218 Ill. at 44.

In a more recent case, a federal court applying Illinois law held that a sanitary district's refusal to expend public funds to reimburse a private seller for the seller's discharge of the district's obligation to pay a use tax was not unlawful *per se*, where the district's refusal to pay was based on its mistaken interpretation of a statute. *Pennwalt Corp. v. Metropolitan Sanitary District of Greater Chicago*, 379 F. Supp. 899, 901 (N.D. Ill. 1974). The court noted that the sanitary district had a duty to litigate the seller's claim before expending public funds.[4] *Pennwalt*, 379 F. Supp. at 901; *cf. Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 128 Ill. App. 3d 678, 681-82 (1984) (prejudgment interest not warranted where retirement board collected funds from city, pursuant to statute, only as needed, in a suit where widow obtained retroactive pension increases; board held money it did not believe it had to pay and, so, it did not wrongfully hold money).

Again, here, we must determine whether the Village wrongfully obtained and illegally withheld funds from Raintree when it enacted the void ordinances and collected the impact fees. Based on the foregoing case law, we must assess whether the enactment of void ordinances (and the collection of impact fees thereunder) constituted fraud or deprived Raintree of an essential service. Clearly, the Village's actions were not fraudulent, nor did they deprive Raintree of an essential service. Therefore, the Village did not wrongfully exact Raintree's

---

[4]In *McKee-Berger-Mansueto, Inc. v. Board of Education of the City of Chicago*, 626 F.2d 559, 566 (7th Cir. 1980), the Seventh Circuit stated that, although the *Pennwalt* court stated the exception differently—that funds must be wrongfully obtained *or* illegally withheld—Illinois Supreme Court cases citing the exception had used the conjunctive "and," which it believed to be the proper test.

funds and hold them without just right or claim, and the trial court did not err in denying Raintree's motion for prejudgment interest.

## III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

ZENOFF, P.J., concurs.

JUSTICE BOWMAN, concurring in part and dissenting in part:

I agree with the majority that the Village of Long Grove (Village) did not have the statutory authority to impose impact fees for schools and open space and that the ordinances imposing such fees are thus invalid. I respectfully disagree, however, with the majority's conclusion that Raintree paid the impact fees under duress because there was a business compulsion to pay them. In my opinion, Raintree paid the impact fees voluntarily, which means that the voluntary-payment doctrine precludes recovery of those fees.

Under the voluntary-payment doctrine, money voluntarily paid on a claim of right to the payment cannot be recovered on the ground that the claim was illegal absent fraud, mistake of fact, or duress. *Ramirez v. Smart Corp.*, 371 Ill. App. 3d 797, 801 (2007). The voluntary-payment doctrine applies to any cause of action that seeks to recover payment on a claim of right, whether that claim is based on a contractual relationship or a statutory obligation. *Ramirez*, 371 Ill. App. 3d at 801. Ordinarily, payment under protest is the *best* evidence of compulsion, and such protest may either be express or appear from the circumstances. *West Suburban Hospital Medical Center v. Hynes*, 173 Ill. App. 3d 847, 855-56 (1988).

In this case, it is undisputed that Raintree built homes in the Village for nearly 10 years. Although Raintree had actual knowledge of the Village's impact fees, at no time during that 10-year period did it pay the fees under protest. As I explain, I do not believe that a builder can have knowledge of the possible invalidity of fees, pay without protest, continue such a course of action for nearly 10 years, and then claim duress. *Cf. West Suburban Hospital Medical Center*, 173 Ill. App. 3d at 856 (the hospital's continued protests and its action of filing suit the very next day constituted overwhelming evidence of protest, which is the best evidence of compulsion).

The majority does not find Raintree's failure to protest the impact fees controlling, and courts have indicated that, although payment

under protest is the typical means by which a payor signifies his contention that a charge is improper, the *absence* of such a protest does not, without more, require the application of the voluntary-payment doctrine. *Ramirez*, 371 Ill. App. 3d at 801; see also *Dreyfus v. Ameritech Mobile Communications, Inc.*, 298 Ill. App. 3d 933, 938 (1998) ("Protest may also serve as evidence of compulsion and an unwillingness to pay; however, it does not conclusively establish compulsion where compulsion is disproved by other circumstances"). The majority points out that our supreme court in *Geary v. Dominick's Finer Foods, Inc.*, 129 Ill. 2d 389, 395 (1989), went so far as to say that "whether plaintiffs had to protest the taxes is irrelevant to the issue of duress because *the absence of a protest is not enough* to establish that a taxpayer made a payment voluntarily." (Emphasis in original.) I agree that the absence of a protest does not bar recovery in all cases. However, our supreme court in *Geary* did not abandon the long-standing proposition that " 'payment under protest is the typical means by which a taxpayer signifies his contention that a tax or charge was improper.' " *Geary*, 129 Ill. 2d at 393, quoting *Getto v. City of Chicago*, 86 Ill. 2d 39, 48-49 (1981). Moreover, even though the absence of a protest is not enough to establish that the payment was voluntary, the failure to protest, *when combined with the other facts and circumstances of this case*, compels a finding that the challenged fees were not paid under duress. See *Dreyfus*, 298 Ill. App. 3d at 938 (in determining whether the plaintiff's payment was made under duress, the court considers all the facts and circumstances surrounding the transaction).

"To defeat the voluntary payment doctrine on the basis of duress, the plaintiff must show that the payment was not voluntary because there was some necessity that amounted to compulsion and that the payment was made under the influence of that compulsion." *Ramirez*, 371 Ill. App. 3d at 802. The recoupment of payments made under duress is limited to items that are necessities, and attention must be given to the nature of the asset involved and the consequences of nonpayment. *Wermers Floorcovering, Inc. v. Santanna Natural Gas Corp.*, 342 Ill. App. 3d 222, 225 (2003). The existence of a reasonable alternative source precludes any arguments about whether a particular product or service is deemed a necessity. *Wermers Floorcovering, Inc.*, 342 Ill. App. 3d at 225; see also *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 849 (1995) (the real and ultimate fact to be determined in every case is whether the party really had a choice and the freedom to exercise his will; economic duress does not exist when the party had a choice as to whether he would do the thing said to be done under duress).

The trial court found that Raintree made the payments under duress because: (1) Raintree did a substantial portion of its business in the Village between 1993 and 1997; (2) constructing a home without a building permit would have subjected Raintree to fines, other penalties, and delay; (3) some of Raintree's contracts required it to deliver completed homes to the purchasers within a specific time; (4) for other purchasers, Raintree verbally committed to deliver completed homes within six to eight months; (5) in order to deliver the homes within those times, Raintree needed to obtain building permits from the Village, and it would have breached its contracts if it had failed to obtain them; (6) Raintree financed its operations by either taking out mortgages or drawing on lines of credit, and any construction delays would have resulted in substantial financial hardship; and (7) conducting business without proper permits was not feasible and would have resulted in the loss of some or all of the contracts, thereby causing severe financial hardship and damage to Raintree's business reputation. The trial court concluded that Raintree's only commercially reasonable course of action was to pay the Village the impact fees. I disagree. In my opinion, the trial court's finding of duress is against the manifest weight of the evidence. See *Wermers Floorcovering, Inc.*, 342 Ill. App. 3d at 224 (the trial court's factual findings regarding duress are reviewed under a manifest-weight-of-the-evidence standard, and a decision is against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite conclusion).

As noted above, Raintree paid the impact fees for almost 10 years before seeking reimbursement.[5] Raintree offered no evidence of why it could not have protested the fees or filed suit, except that it would not have been profitable to do so. Brown, Raintree's president, testified that he did not write "paid under protest" on the checks written to the Village for the fees because he did not believe that the Village would accept the checks if they included that language. However, Brown offered no evidence of why he could not pay under protest in the Village. See *Smith*, 276 Ill. App. 3d at 855 (the plaintiffs' allegations of threatened loss was conjecture, speculative, and unsupported by any facts). Brown admitted that he considered filing a lawsuit to challenge the fees, but decided against it because of the time involved in litigating the matter and because he did not think he could be building in the Village while the litigation was pending. Yet, the record

---

[5]Although Raintree paid impact fees from 1988 to 1997, it sought reimbursement for fees paid only from 1993 to 1997, due to the statute of limitations.

shows that Raintree challenged the same fees in Kildeer. The trial court noted that Raintree was paying impact fees to Kildeer while it was paying impact fees in the Village, and Brown conceded that Raintree did sue Kildeer to recover those fees. Significantly, the trial court did not find credible Brown's testimony that he did not believe that he could pay the fees under protest in the Village. In its decision, the court specifically noted that "payments of impact fees to the Village of Kildeer were accompanied by oral protests and written objections demonstrating that [Raintree] was aware of such procedures to reserve their rights to claim a refund again, contrary to their assertions."

Not only did Raintree fail to protest the fees, it failed to establish the necessity of building in the Village. See *Geary*, 129 Ill. 2d at 393 (it must be shown that there was some *necessity* amounting to compulsion and that the payment was made under the influence of such compulsion). On this point, I disagree with the trial court's finding that Raintree did a substantial portion of its business in the Village. Whereas Brown testified that Raintree conducted 90% of its business in the Village, former Raintree president Eckert testified that from 1993 to 1997, the period for which it sought to recover, the majority of Raintree's business was located in Kildeer, where it had the majority of its property. Eckert also contradicted Brown's testimony that a two-year delay in building as a result of filing suit would have "probably" put Raintree out of business. According to Eckert, Raintree conducted only one-third of its business in the Village and two-thirds of its business in other communities. Eckert testified that Raintree did business in Barrington, South Barrington, Hawthorn Woods, Kildeer, and Vernon Hills. See *Wermers Floorcovering, Inc.*, 342 Ill. App. 3d at 226 (when a party has alternative sources available and could have opted out of making a disputed payment, then the asset involved is not a necessity, the duress exception does not apply, and the voluntary payments cannot be recouped). As the Village points out, Raintree built approximately four homes per year in the Village from 1988 to 1997, comprising about one-third of Raintree's business. Raintree asserts that its controlling motive for paying the impact fees was the desire to avoid adverse economic consequences of being unable to build in the Village, but this desire did not make building in the Village a necessity. Given the options available, Raintree's decision to continue to subject itself to the impact fees in the Village was its own choice.

The cases relied upon by the majority to show economic duress are distinguishable in key respects. For example, in three of the cases cited by the majority, the plaintiff either paid under protest or filed suit immediately. See *Edward P. Allison Co. v. Village of Dolton*, 24 Ill. 2d 233, 234-35 (1962) (the electrical contractor paid the fees under

protest, filed suit within two years, and did not continue to work in the village); *Rosen v. Village of Downers Grove*, 19 Ill. 2d 448, 455 (1960) (the large-scale developer paid under protest and wrote a letter reserving its right to a refund); *United Private Detective & Security Ass'n v. City of Chicago*, 56 Ill. App. 3d 242, 245 (1977) (the detectives filed suit two days after the fees were paid).

In various other cases relied upon by the majority, where no protest was made, the good or service constituted a necessity. In *Geary*, 129 Ill. 2d at 395, for example, the plaintiffs, despite their lack of protest, alleged that tampons and sanitary napkins were necessities, which the supreme court found sufficient to plead duress. In *Getto*, the plaintiff paid his telephone bills without protest and then challenged the method the defendants used in calculating a tax imposed on telephone service. The supreme court reasoned that the implicit and real threat that phone service would be shut off for nonpayment of charges amounted to compulsion that would forbid application of the voluntary-payment doctrine. *Getto*, 86 Ill. 2d at 51. Also, in *People ex rel. Carpentier v. Treloar Trucking Co.*, 13 Ill. 2d 596 (1958), the truck operator tried to apply for the appropriate weight classification but was prevented from doing so by the Secretary of State. The evidence showed that the company could not carry on its business without Illinois license plates and that the payment was made under duress. *People ex rel. Carpentier*, 13 Ill. 2d at 600; see also *People ex rel. Carpentier v. Arthur Morgan Trucking Co.*, 16 Ill. 2d 313, 320 (1959) (same).

Finally, the majority cites several cases to support its assertion that necessity (and protest) are not the only bases upon which recoupment is allowed when proving duress. I disagree and believe that necessity is required to establish duress. As previously mentioned, our supreme court stated in *Geary* that, to show that a payment was not voluntary, it must be shown that " 'there was some *necessity* which amounted to compulsion' " and that the payment was made under the influence of such compulsion. (Emphasis added.) *Geary*, 129 Ill. 2d at 393, quoting *Getto*, 86 Ill. 2d at 48-49. In this case, for the reasons stated above, Raintree failed to show that building in the Village was a necessity. And, despite knowledge of the possible invalidity of the fees, Raintree elected to do business in the Village for 10 years before filing suit. In my opinion, these facts distinguish this case from the cases relied upon by the majority, where necessity was shown.

For instance, in *DeBruyn v. Elrod*, 84 Ill. 2d 128, 136 (1981), the plaintiffs were confronted with the choice of payment of the sheriff's fees or his refusal to effect the requested sale, execution, or redemption of the real estate under foreclosure. Stating that the plaintiffs in

*DeBruyn* were in the same position as the plaintiffs in *Ross v. City of Geneva*, 71 Ill. 2d 27 (1978), who paid their electrical bill, for an essential service, under duress, the *DeBruyn* court found that the plaintiffs, in making the payment, acted with prudence and were not barred from recovering. *DeBruyn*, 84 Ill. 2d at 136; see also *Norton v. City of Chicago*, 293 Ill. App. 3d 620, 627-28 (1997) (where the plaintiffs paid a $3 delinquent penalty fee on parking fines, and the demand notices sent to the plaintiffs threatened further legal action, a default judgment, or the maximum fine allowed by law, the notices were coercive enough to render the plaintiffs' payment involuntary); *Ball v. Village of Streamwood*, 281 Ill. App. 3d 679, 688 (1996) (duress excused the plaintiffs' "voluntary" payment of the transfer tax because the plaintiffs' residences were subject to contracts to sell to third parties and the village code provided civil penalties for failure to pay the tax); *Terra-Nova Investments v. Rosewell*, 235 Ill. App. 3d 330, 337 (1992) (relying on *DeBruyn* and *Ross*, the court held that the tax buyer at a scavenger tax sale had little choice but to pay the fee to the county collector).

In sum, the facts in this case are that Raintree paid the Village's fees without protest for a period of almost 10 years despite knowledge that they might have been invalid; Raintree protested the same fees in Kildeer; Raintree conducted business in several communities besides the Village; and Raintree failed to establish that building in the Village was an economic necessity. See *Smith*, 276 Ill. App. 3d at 853 (where the plaintiffs did not allege that they had exhausted all options available to them before they made payment; did not allege any attempt at resolution; did not allege that they contacted the cable company to voice their objection to the charge; and did not allege any knowledge by the cable company that a dispute existed, they did not plead duress). Under these facts, I believe that the trial court's finding of duress is against the manifest weight of the evidence and that the voluntary-payment doctrine precludes recovery of the fees. Because Raintree is not entitled to recoupment, I need not address Raintree's cross-appeal concerning prejudgment interest.